**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 28, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PAMELA A. RAY,

      Plaintiff-Appellee,

v.

UNUM LIFE INSURANCE COMPANY
OF AMERICA, a Maine corporation,

      Defendant-Appellant.

No. 05-1284 & 05-1420

(Consolidated)
(D.C. No. 97-CV-556-WFD-BNB)
(D. Colorado)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, HOLLOWAY,** and **LUCERO**, Circuit Judges.

UNUM Life Insurance Company of America ("UNUM") appeals the district

court's award of long-term disability benefits to Pamela Ray ("Ray") pursuant to her

claim under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §

1132. UNUM presents five arguments on appeal, which dispute: (1) the district court's

refusal to consider evidence beyond the claim record that was closed in 1997, or in the

alternative, the court's decision to award Ray benefits for the eight years after the record

---

[*]This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

was closed; (2) the district court's determination that working in a large office building environment was a material duty of Ray's occupation; (3) the district court's finding that Ray was totally disabled; (4) the district court's award of future disability benefits; and (5) the district court's award of attorney fees. We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Ray was a partner at Gibson, Dunn & Crutcher ("GD&C") in Denver, Colorado, from 1982 to May of 1995, and specialized in major real estate transactions and oil, gas, and mining transactions. She was insured under the firm's Group Long Term Disability Insurance Policy ("the Plan") issued and administered by UNUM. The Plan provides monthly disability benefits to the insured upon proof of disability. An insured is disabled when he or she is unable to "perform each of the material duties of his [or her] regular occupation." App. at 266. The Plan notes that "[f]or attorneys, 'regular occupation' means the speciality in the practice of law which the insured was practicing just prior to the date disability started."[1]  Id.

---

[1] The Plan specifically provides:

When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:

(1) disability; and
(2) regular attendance of a physician.

(continued...)

-2-

GD&C's office is located in a high-rise office building in downtown Denver. In the fall of 1992, Ray moved to a different office on the same floor she had worked on for the past ten years. Six months later, around March of 1993, Ray began to suffer from respiratory and sinus symptoms, including a cough, dizziness, fatigue, sinus pressure and pain, and chest congestion. Ray was forty-four years old at the time her symptoms began. Her secretary, who sat directly across the hall, experienced similar symptoms.

Ray saw several physicians, including a pulmonary disease specialist, a specialist in occupational and pulmonary medicine, and a specialist in otolaryngology (ear, nose, and throat) for her symptoms. According to these physicians' notes, Ray's symptoms were alleviated on the weekends when she was away from the office. Ray saw Dr. Rose, a specialist in occupational and pulmonary medicine at National Jewish Center for Immunology and Respiratory Medicine, on several occasions from September of 1993 through February of 1994. After Ray's initial visit, Dr. Rose recommended several tests and concluded that if they all turned out negative, Ray's symptoms may be attributed to sick building syndrome. She commented that prior to this consultation, Ray had moved offices several times, trying out several different offices on two different floors of her

---

[1](...continued)
The applicable policy provision defining "Disability" states:

"Disability" and "disabled" mean that because of injury or sickness the insured cannot perform each of the material duties of his regular occupation.

Note: For attorneys, "regular occupation" means the specialty in the practice of law which the insured was practicing just prior to the date disability started. App. at 266, 268.

building without relief and that an environmental evaluation of the building was negative for any abnormalities. She also noted that one week prior to this appointment, Ray had moved her office to her home.

Ray saw Dr. Rose again in October of 1993 and reported that she felt rested and less fatigued. Ray had been working from home and going into the office for a half an hour each day. Dr. Rose noted that Ray did not like working from home, but advised Ray to wait six more weeks, see if she improved, and then consider going back to the office. Ray saw Dr. Rose again in December and informed her that she felt about 85% improved but still had constant head cold symptoms, including headaches and sinus pressure. Ray also told Dr. Rose that she hoped to move from her home office into an office in a different high-rise building. At a visit in January of 1994, Ray complained that her sinus headache had gotten much worse and that she still felt very fatigued.

In February of 1994, Ray visited Dr. Rose and informed her that her symptoms had returned with her move to a new temporary office space in a different building. Dr. Rose prepared a summary report of her previous visits and determined that "[a]t this point, I had nothing further to offer with regard to either diagnostic or therapeutic interventions." Id. at 852. She commented that Ray asked for an assessment for disability because her symptoms had persisted and "she is unable to perform her usual job duties in an office environment as an attorney despite aggressive medical treatment of underlying sinusitis." Id.

Ray filed a claim for disability benefits in June 1994 listing severe fatigue,

headaches, dizziness, chest pain, and allergic reactions to chemicals as preventing her from working. She indicated that her symptoms were related to the workplace and explained the progression of her symptoms:

> [s]ymptoms of severe sinusitis commenced in February 1993. Did not respond to antibiotics. Continued to work. May 1993, I had severe headaches and fatigue but continued to work at reduced level. June 1993, I could only work half days. Late September 1993, I could not work at office, but continued to work at home. January 1994, I tried to work at an office in another building and my symptoms became worse. In February 1994, I returned to work at my office and my symptoms became much worse. April 1, 1994 I stopped working. I am claiming disability from January 1, 1994. Id. at 930.

She also attached a note from Dr. Rose, noting that Ray had undergone "extensive diagnostic evaluation" and "ha[d] not obtained significant symptomatic improvement despite multiple interventions," a CT scan showed moderately severe chronic sinusitis, and that Ray reported "significant improvements in her symptoms with removal from her workplace." Id. at 928-29. Finally, Dr. Rose concluded that, "[w]hile her symptoms are clearly not limited to occupancy of a single office building, Ms. Ray does report significant symptomatic worsening with occupancy of office buildings which interferes with her ability to perform her usual job duties as an attorney." Id.

In August of 1994, an UNUM representative, Julie Sheerin ("Sheerin"), met with Ray and George Curtis ("Curtis"), the managing partner of GD&C. Sheerin reported that Ray informed her that her symptoms had improved since she stopped going to the office, but that she attends partner meetings once a month and experiences symptoms within a half an hour of entering the building. Ray also told Sheerin that she cannot work

effectively from home because clients are not happy with the arrangement and a significant part of her occupational duties includes working with and training associates. Ray indicated that she might have difficulty finding work at another firm because typically only a large law firm would have clients who could afford her expensive billing rate. Sheerin concluded her report with the recommendation,

> [w]e may want to consider having DMS review the file to determine whether she feasibly could work at other firms with her billable rate. Also we may want to determine if it is possible for her to work at some smaller firm with her specialty. It would seem that since she is able to go back to stores, etcetera, she should be able to practice in some sort of building. Id. at 202.

During his meeting with Sheerin, Curtis confirmed that Ray was "very pale and always hacking" at the office and that working from home was not an acceptable alternative. Id. at 187.

> On November 30, 1994, UNUM sent Ray a letter denying benefits because
>
> our regional consulting physician concluded based upon his review of the extensive records contained in [your] file that you retained the functional capacity to perform each of the material duties of your occupation at least at home and most likely sites other than the office where your symptoms began during construction and renovations. Id. at 711.

Ray's attorney sent a letter to UNUM requesting a review of the denial and a copy of Ray's claim file. On March 3, 1995, UNUM informed Ray that the decision to deny her benefits was correct because Ray "is not precluded from performing her occupation with a different employer, at sites other than the office where her symptoms began. The medical evidence supports significant improvement in her symptoms with removal from her workplace." Id. at 693.

Ray's attorney then wrote to UNUM asking for more time to supplement Ray's claim record and pointing out what he considered to be serious flaws in UNUM's decision to deny benefits. He noted that: (1) UNUM's determination that working from home was an acceptable alternative was wrong, as evidenced by Ray's and Curtis' statements to Sheerin; (2) there was no renovation or construction at any time in Ray's building; (3) Ray did not significantly improve when moved to another office building; and (4) Ray's "regular occupation" was integrally and inextricably dependent on her position at GD&C. Additionally, Ray attached a letter from one of her treating physicians, Dr. Schocket, which stated in relevant part:

> [d]espite not being able to find a specific cause for Ms. Ray, I have no doubt that she is disabled and unable to perform the duties required by her previous occupation and work situation. This is similar to the situation of many of the patients diagnosed with the above mentioned illnesses. Id. at 208.

Dr. Rose also wrote to UNUM, after reviewing the memorandum documenting Sheerin's meeting with Curtis, and noted:

> I certainly cannot guarantee that Ms. Ray's symptoms will not recur in a different office environment. Furthermore, my statement that Ms. Ray could work out of her home was based on her report of having done so, but did not reflect any review of the requirements of her occupation which might be curtailed if she were forced to work out of the home. As I indicated during our discussion, my expertise is limited to the medical issues in this case, and I am not a vocational rehabilitation specialist. Id. at 211.

In May of 1995, Ray's attorney forwarded letters to UNUM from two attorneys who practice complex real estate law and were familiar with Ray's practice. These letters explained why Ray could not work from home or a remote office location, why Ray could

not easily transfer to another firm, and why Ray's specialty was dependent upon a large law firm environment. Additionally, UNUM received a CT scan taken several months after Ray ceased exposure to her office building, which showed considerable improvement in her sinus cavity.

In October of 1995, UNUM overturned Ray's denial of benefits, finding she was "disabled due to fatigue of unknown etiology" and stated in a letter to Ray's attorney, "we are not convinced that she is disabled; but, will explore a possible psychiatric component to her fatigue. We would bring benefits up to date and continue paying under reservation of rights and continue to investigate Ms. Ray's claim to clarify her disability and its cause." Id. at 304, 632. In the alternative, UNUM offered to pay Ray $190,000 as a full and final settlement of her claim.

UNUM conducted surveillance of Ray over the course of several days on three separate occasions. The surveillance from June of 1996 showed Ray attending a five-day alpaca convention, at which she set up a booth, engaged in business-type activities, and handled alpacas. UNUM also requested more information from Ray's treating physicians. Dr. Staudenmayer, Ray's psychologist, responded and commented that "there [has been no] identifiable psychological condition which could explain [Ray's] intolerance. The focus of our treatment in the past 15 months has been on coping with her symptoms of headache, fatigue and insomnia which are exacerbated by exposure to environmental chemicals." Id. at 535. He added that "[t]here are no particular activities or duties that she cannot perform. Rather, it is the limits imposed by being in certain

buildings." Id. "The limitations which prevent her from working are the environment, particularly office buildings." Id. Dr. Metzner, Ray's psychiatrist, responded that he treated her in the past for atypical anxiety disorder, that the "most significant stressor in Ms. Ray's life is her inability to return to her former job as an attorney," and "[i]t is my opinion that Ms. Ray's symptoms of headaches and fatigue are not related to a psychiatric disorder." Id. at 519-20.

In July of 1996, after another in-house physician reviewed Ray's file, UNUM offered a final determination denying benefits. Ray requested another review, noting: (1) UNUM's disregard of her inability to work from home and the difficulty of finding comparable employment with a different firm; (2) UNUM failed to advise Ray, despite repeated requests, of what evidence it would consider sufficient to demonstrate Ray's disability; and (3) nothing in the surveillance indicated that Ray was capable of "day in, day out, long days of mental exertion, in an office building environment, required to perform her former occupation." Id. at 424.

UNUM then referred Ray's case to the University Disability Consortium ("UDC"), which issued a report and concluded that Ray was not disabled. The UDC panel consisted of an internist, an allergist, and a psychiatrist. The internist concluded that: (1) the only documented abnormality on objective testing of Ms. Ray is that of mild sinusitis in September of 1993; (2) the remaining symptoms of fatigue and headache are subjective; (3) she was never tested for allergies related to her alpaca farming, as she did not convey this to her physicians; and (4) the sole findings of rhinitis and possible chronic

sinusitis would not explain her symptoms of claimed severe persistent fatigue and headaches and her consequent self-reported disability from performing her occupational duties as an attorney. The allergist commented that Ray's problems may stem from menopause. The psychiatrist noted his disbelief that Ray's treating physicians did not attribute her physical symptoms to a possible psychological disorder. The panel concluded that it did not find "evidence to substantiate objective findings or impairments that would preclude gainful employment in her occupation." Id. at 364.

Following this report, UNUM requested that Ray undergo an in-person evaluation ("IME") by each of the three UDC physicians in Boston. Ray refused and filed a lawsuit against UNUM in March of 1997 as permitted by 29 U.S.C. § 1132(a). After a bench trial, the district court determined that UNUM's denial of disability benefits was arbitrary and capricious and awarded Ray benefits. Ray v. UNUM Life Ins Co. of Am., 314 F.3d 482, 483 (10th Cir. 2002).

UNUM appealed and this court reversed and remanded with instructions for the district court to apply a de novo review, holding that when an ERISA plan is not discretionary, a district court should conduct a de novo review of the evidence, and consider at its discretion, evidence outside the administrative record. Id. at 486-87. This court specifically commented on the district court's refusal to consider the UDC report and then noted:

> [t]his being the situation, and given our decision that we can not conduct adequate de novo review at this level (as have other circuits, named above) without the benefit of such additional report and/or other further medical reports, we must

remand. Our remand allows the district court to consider such additional evidence as in its discretion it finds necessary for adequate de novo review, including court-appointed expert reports if it determines them helpful. Id. at 488.

On remand, the district court applied a de novo review and considered the UDC report in addition to the administrative record and concluded that Ray was entitled to long-term disability benefits from July 27, 1996, until she reached the age of 65 "unless and until some change occurs in her condition which renders her no longer 'disabled.'" App. at 1077.

II.

We review the district court's legal conclusions de novo and its factual findings under the clearly erroneous standard. Anderson v. Comm'r of Internal Revenue, 62 F.3d 1266, 1270 (10th Cir. 1995); Fed. R. Civ. P. 52(a) ("findings of fact . . . shall not be set aside unless clearly erroneous"). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985) (citations omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 573-74.

"In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." Id. at 573. The factfinders's choice between two

permissible views of the evidence cannot be clearly erroneous. Id. at 574. "This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." Id.

*1. Evidence Beyond 1997 and Award of Future Benefits*

    *a. Did the District Court Err in Refusing to Consider Evidence After 1997?*

On appeal, UNUM argues that the district court abused its discretion by initially ruling that it would obtain its own expert, then later confining its review to the administrative claim record as it existed in early 1997 and the UDC report. When a district court reviews a denial of benefits de novo, we permit "the district court to supplement that record 'when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision.'" Hall v. UNUM Life Ins. Co. of Am., 300 F.3d 1197, 1202 (10th Cir. 2002). "[I]t is the unusual case in which the district court should allow supplementation of the record." Id. at 1203. "Cumulative or repetitive evidence, or evidence that 'is simply better evidence than the claimant mustered for the claim review' should not be admitted." Id.

This court expressly stated in Ray v. UNUM, "[o]ur remand allows the district court to consider such additional evidence as in its discretion it finds necessary for adequate de novo review, including court-appointed expert reports if it determines them helpful." 314 F.3d at 488 (emphasis added). In reviewing the district court's decision to limit its de novo review to the administrative record and the UDC report, we will only reverse if we find the district court's determination to be "an arbitrary, capricious,

-12-

whimsical or manifestly unreasonable judgment." Coletti v. Cudd Pressure Control, 165

F.3d 767, 777 (10th Cir. 1999).

The district court noted that because Ray's case involved complex medical

questions and the court had previously expressed concerns about UNUM's impartiality, it

would consider supplementing the record. The court then decided to consider the UDC

report, but not to seek the opinion of a court-appointed expert finding "that such an

opinion would merely be cumulative and not helpful in light of the Court's consideration

of the UDC report, and the fact that Plaintiff's various treating physicians appear to be

preeminent experts in this area."[2] App. at 1032-33.

The district court did not abuse its discretion in deciding not to seek the opinion of

a court-appointed expert and in considering only the administrative record, including the

UDC report. The administrative record should only be supplemented in an unusual case

and cumulative evidence should not be admitted. Hall, 300 F.3d at 1203. In addition,

this court, in remanding the case, reiterated that it was within the district court's

discretion to consider additional evidence, "including court-appointed expert reports if it

determines them helpful." Ray, 314 F.3d at 488. The court determined that additional

evidence would be cumulative and not helpful in the present case. Therefore, we cannot

conclude that the district court's decision not to appoint an expert and to confine its

review to the administrative record and the UDC report was "an arbitrary, capricious,

_____

[2] The district court tentatively decided to appoint an expert, Dr. Bardana, but after further investigation decided that the Dr. Bardana was an "advocate on this issue, and we have enough advocates in this case." App. at 1372.

whimsical or manifestly unreasonable judgment." Coletti, 165 F.3d at 777.

### b. Award of Future Benefits

In the alternative, UNUM argues that the district court erred as a matter of law by awarding Ray benefits for the eight years after the claim record was closed because there was no updated information as to Ray's condition and Ray failed to exhaust the administrative review process by refusing to provide UNUM with updated medical records and failing to prove regular attendance of a physician. In response, Ray contends that UNUM bears the burden of generating an administrative record to support a termination of benefits.

We review a district court's remedy for an ERISA violation for an abuse of discretion. DeGrado v. Jefferson Pilot Fin. Ins. Co., 451 F.3d 1161, 1176 (10th Cir. 2006). "Generally speaking, when a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it 'can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award a retroactive reinstatement of benefits.'"[3] Id. at 1175 (quoting Cook v. Liberty Life Assurance Co. of Boston, 320 F.3d 11, 24 (1st Cir. 2003)). This determination "depends upon the specific flaws in the plan administrator's decision." Id. "In particular, if the plan administrator 'fail[ed] to make adequate findings or to explain adequately the grounds of [its] decision,' the proper remedy 'is to remand the case to the administrator

---

[3] Although the case law specifically refers to arbitrary and capricious, rather than de novo review of a plan administrator's decision, the underlying rationale supporting a remand versus a reinstatement of rights is applicable.

-14-

for further findings or explanation.'" Id. (quoting Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1288 (10th Cir. 2002)).

However, a "retroactive reinstatement of benefits is appropriate in ERISA cases where, as here 'but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits' or where 'there [was] no evidence in the record to support a termination or denial of benefits.'" Cook, 320 F.3d at 24 (quoting Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1163 (9th Cir. 2001)). "A remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable." Id. (quoting Zervos v. Verizon New York, Inc., 277 F.3d 635, 648 (2d Cir. 2002)).

The Plan at issue provides a maximum benefit period until the age of 65 as long as the insured "gives to the Company proof of continued: (1) disability; and (2) regular attendance of a physician."[4] App. at 268. However, "[t]he proof must be given upon

---

[4] UNUM makes much of the fact that Ray's allergist, Dr. Schocket, did not answer the questions UNUM sent to him in early 1996 because Ray had not met with him for approximately one year. UNUM argues that Dr. Schocket's failure to answer its questions indicates that Ray was no longer disabled in 1996 and demonstrates her failure to comply with the Plan's requirement of regular attendance of a physician. In actuality, UNUM representatives spoke with a medical records clerk at Dr. Schocket's office, who sent Ray's medical records, but commented that "Dr. didn't comment on our [UNUM's] questions as he hasn't seen [claimant] for [approximately] one year." App. at 524.

This argument is unpersuasive. First, the Plan required UNUM to request continuing proof of disability and regular attendance by a physician from the insured, which it failed to do. Second, as noted by the district court, Ray was attended by several physicians who ultimately instructed her to avoid the buildings that caused her symptoms

(continued...)

-15-

request and at the insured's expense." Id. (emphasis added). The Plan also states that "[p]roof of continued disability and regular attendance of a physician must be given to the Company within 30 days of the request for the proof." Id. at 277 (emphasis added). The language of the Plan explicitly states that UNUM bears the burden of requesting proof of continued disability. The record reveals that UNUM never requested continuing proof of disability from Ray after 1996. Because the language of the Plan requires UNUM to request continuing proof of disability and UNUM failed to request such proof after 1996, it cannot now argue that the district court's award of future benefits was an abuse of discretion based on a lack of evidence in the record. "It would be patently unfair to hold that an ERISA plaintiff has a continuing responsibility to update her former insurance company and the court on her disability during the pendency of her internal appeals and litigation, on the off chance that she might prevail in her lawsuit." Cook, 320 F.3d at 24-25.

Additionally, a district court does not abuse its discretion in reinstating benefits, rather than remanding a case to the Plan administrator. See id. ("A remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable."); Grosz-Salomon, 237 F.3d at 1163 ("In other words, a plan administrator

---

[4](...continued)
because they had exhausted other treatment regimens. Based on her diagnosis and treatment regimen (avoidance of large office buildings), the fact that Ray had not seen her allergist in over a year does not indicate that she was no longer disabled.

will not get a second bite at the apple when its first decision was simply contrary to the facts."). The district court concluded that Ray's claim for benefits was supported by a preponderance of the evidence and UNUM's decision to deny her benefits was erroneous. Based on this, we cannot conclude that the district court abused its discretion in awarding Ray future benefits.

*2. District Court's Determination that Working in a Large Office Building Environment was a Material Duty of Ray's Occupation*

UNUM also argues that the district court erred in finding that working in a large office building environment was a material duty of Ray's occupation at GD&C as a real estate attorney. Specifically, it contends that because Ray began her practice at a small law firm, she cannot claim that her practice requires a large law firm setting. Ray asserts that the district court made the proper factual determination that all or virtually all lawyers with Ms. Ray's practice specialty work for large firms in large office buildings, and the specialty itself is integrally dependent on a large firm setting. Ray also claims that UNUM: (1) ignored statements from Ray and Curtis about the nature of her specialty; (2) disregarded occupational explanations offered by attorneys with the same specialty; (3) refused to respond to Ray's plea for ideas on how to test alternative work environments; and (4) failed to obtain any other occupational information.

The Plan states that:

"Disability" and "disabled" mean that because of injury or sickness the insured cannot perform each of the material duties of his regular occupation.

Note: For attorneys, "regular occupation" means the specialty in the practice of

-17-

law which the insured was practicing just prior to the date disability started. App. at 266.

The district court concluded that the "ability to function in a large office building environment is itself a material duty of Plaintiff's regular occupation." Id. at 1075. As factual support for this conclusion, the court noted:

> [p]laintiff further presented proof that her sickness rendered her "disabled" as that term is defined in the Policy for attorneys. None of the physicians or other persons reviewing Plaintiff's claim on behalf of UNUM demonstrated any understanding of "each of the material duties of her regular occupation." In fact, UNUM made no attempt to evaluate how Plaintiff's sickness effected [sic] her ability to perform "the specialty in the practice of law which [she] was practicing just prior to the date disability started." The undisputed evidence in the record, as opposed to UNUM's speculation, indicates that Plaintiff could not continue to practice in her "specialty" with GD&C from her home or some other office location. The evidence further demonstrates the improbability of Plaintiff finding equivalent employment and that, even if she could, the types of law firms which practice in Plaintiff's "specialty" are typically located in large office buildings. Id.

"We review mixed questions under the clearly erroneous or de novo standard, depending on whether the mixed question involves primarily a factual inquiry or the consideration of legal principles." Armstrong v. Comm'r of Internal Revenue, 15 F.3d 970, 973 (10th Cir. 1994). The district court's determination that the ability to function in a large office building environment is itself a material duty of Ray's regular occupation is primarily a factual determination requiring application of the clearly erroneous standard. "A finding of fact is clearly erroneous if it is without factual support in the record or if the appellate court, after reviewing all the evidence, is left with a definite and firm conviction that a mistake has been made." Manning v. United States, 146 F.3d 808, 812 (10th Cir. 1998).

-18-

The administrative record contains statements from Curtis, GD&C's managing partner, that Ray could not work from home. Sheerin interviewed Curtis on August 31, 1994. She reported:

> Mr. Curtis said that having Ms. Ray work at home was not working well at all. She needs to be able to meet and interact with the attorneys and associates for research and training. She also needs to be available to her clients and working at home was not allowing this availability. Mr. Curtis said that working at home was not effective at all. He stated this would not be an acceptable work alternative. App. at 187-88.

Curtis also confirmed that Ray had switched offices several times in her original building and had also tried working in a different building with no relief from her symptoms.

> Sheerin also interviewed Ray and her report from this interview stated:
> Ms. Ray has been practicing law for 21 years. Out of school she litigated for four to five years. In 1976 she had her own firm where she litigated and handled cases involving oil, gas and mining. Since 1982, she has specialized in real estate. She says she still handles a little oil, gas and mining because no one else in the firm has this experience.
>
> As a partner with the policyholder, she worked mostly in the office with little travel. Normally, the clients would come to her office. She said it was not really possible to work effectively out of her home. The clients were not happy with this arrangement, as she was not available to them since she would not be in the office. As well, much of her job involved teaching and helping associates, this is not possible with her working at home. Id. at 200-01.

Ray's attorney also forwarded letters to UNUM from two real estate attorneys at large law firms, who concurred that working from home is not an effective alternative for attorneys with their specialty and that it is difficult, if not impossible, to transfer to another firm. Karen Clark ("Clark"), a real estate partner with GD&C's Irvine, California, office commented that, "it would be difficult, if not impossible to run a

Gibson, Dunn & Crutcher partners' practice from home," and that "our practice is not easily transportable and equivalent employment would be difficult if not impossible to find." Id. at 214-15.[5] Robert Brown ("Brown"), a real estate attorney with Sherman & Howard, a large Denver law firm, commented in relevant part that:

> [i]n summary, Ms. Ray's practice is notable by the size and complexity of the transactions she handled. It is critical to note that the source of virtually all of the significant client matters handled by Ms. Ray was either Gibson Dunn as a firm, including other offices of Gibson Dunn, or Gibson Dunn lawyers who referred the real estate work to Ms. Ray. If Ms. Ray were to move to another firm to conduct her practice, this source of business, that is nearly all of the significant work performed by Ms. Ray, would immediately disappear. Ms. Ray's practice is also characterized by the large size and complexity of the transactions she worked on. This requires the participation of other specialists and junior lawyers and legal assistants which cannot be adequately provided and supervised if Ms. Ray cannot on a regular basis be present in the main office where these lawyers and legal assistants are located. Id. at 220.

At the time she became disabled, Ray's legal specialty was handling major real estate transactions and some oil, gas, and mining transactions at GD&C. The record reveals that the material duties of Ray's specialty included handling large scale real estate transactions, as well as some oil, mining, and gas work, training associates, interacting with other attorneys, and serving clients. The district court found that working in a large office building environment was also a material duty of Ray's specialty. The record supports the district court's finding because it demonstrates that: (1) Ray could not work

_____

[5] The concurrence cites Clark's practice "at one of GD&C's satellite offices" as support for its conclusion that Ray need not locate in a large office building to pursue a practice in her speciality. Our record contains no information regarding the number of attorneys and support staff employed at the Irvine, California, office of GD&C. Concurrence at p. 5.

from home or a remote location; (2) her practice is not easily transferable to another firm and equivalent employment would be very difficult, if not impossible, to find; and (3) even if Ray could find equivalent employment, her employer would most likely be located in a large office building environment because her practice requires the resources of a large firm, specifically in terms of client base, client referrals, interaction with attorneys from related specialities, legal materials, and support from associates and legal assistants. UNUM repeatedly ignored and refused to acknowledge this evidence in the record.

There is substantial evidence in the record that Ray cannot work from home or a remote location. Curtis, GD&C's managing partner, explicitly stated that Ray working from home was not an acceptable option because she is needed in the office to train associates and meet with and serve clients. Ray reiterated these concerns. Additionally, the letters from Clark and Brown commented on the impossibility of conducting a major real estate transaction practice outside of the office. Clark noted that the "complexity and sophistication" of the work require "a great deal of interaction with other partners, associates and staff." Id. at 214. She also commented that necessary materials are at the office and that most of her work results from interaction with partners from other specialities at her firm who refer their clients to her for their real estate needs.

Brown confirmed that Ray's type of practice (which he classified as a large firm real estate practice) is highly dependent on clients who have traditionally been clients of her firm or have been developed by other partners at her firm. He noted that Ray would

-21-

only continue to receive referrals if she was readily available to clients and other GD&C attorneys and remained a GD&C lawyer. He commented that because real estate transactional work requires quick, if not immediate response to client needs, and often consultation with lawyers in other specialties, including tax, environmental, or municipal law, it is extremely difficult to carry on a productive large-scale real estate transaction practice from home or a remote location.

The record also contains substantial evidence that Ray would be unable to transfer her practice to another firm or find equivalent employment. Ray expressed concerns to UNUM that if she were to work for another law firm, it would have to be a large firm for clients to afford her expensive billing rate. Clark and Brown also reiterated that Ray would find it difficult, if not impossible, to transfer her practice to another firm. Clark commented that Ray's clients were most likely initially attracted to GD&C, rather than Ray as an individual, and would be unlikely to follow Ray to another firm. She noted that another firm would be unlikely to hire a partner that could not bring with her a substantial client base. Brown stated that "[s]enior lawyers without a significant client base have an extremely difficult time securing employment by, much less becoming a partner in, a law firm of any significant size" and "[b]ecause Ms. Ray does not have the ability reasonably to induce any significant portion of the clients for whom she worked to transfer their legal work to another law firm, it is a virtual impossibility for Ms. Ray to be employed by another large law firm." Id. at 219-20.

To summarize, the record reveals the following facts: (1) Ray's specialty at the

time she became disabled was complex and sophisticated real estate transactions; (2) this type of work requires the resources of a large firm, specifically in terms of client base, client referrals, interaction with attorneys from other related specialties, legal materials, and support from associates and legal assistants; (3) Ray would find it difficult, if not impossible, to transfer her practice to another firm; (4) Ray experienced symptoms in two different large office buildings and several different office locations; and (5) Ray's physicians could not pinpoint what aspect of a large office building environment triggered her symptoms.

Although all large law firms may not be located in downtown large office buildings or high-rises, large law firms must be located in buildings large enough to accommodate their many employees. Therefore, even if Ray could find equivalent employment, her employer would most likely be located in a large office building environment. Because Ray has exhibited symptoms in several different office locations in two different large office buildings and her doctors cannot specify what particular aspect of a large office building environment she must avoid, Ray would likely experience similar symptoms in most, if not all, large office buildings occupied by large law firms. Based on this, we cannot conclude that the district court's finding that working in a large building was a material aspect of Ray's legal specialty was clearly erroneous.

UNUM has failed to provide any evidence in the record disputing this finding. During Ray's claim review and appeal process, UNUM ignored evidence indicating that

she could not work from home or at a small firm. Instead, it continually asserted, without factual support or understanding of the material duties of Ray's occupation, that she should be able to work from home. In fact, UNUM never addressed the concerns and recommendations of its own representative, Sheerin, who noted after interviewing Ray, "[w]e may want to consider having DMS review the file to determine whether she feasibly could work at other firms with her billable rate. Also we may want to determine if it is possible for her to work at some smaller firm with her specialty." Id. at 202. The record is devoid of any evidence that UNUM followed up on this referral or ever responded to any of Ray's repeated requests for possible alternative work solutions.

Finally, UNUM's primary argument in support of its assertion that working in a large building is not a material duty of Ray's occupation is its contention that she began her career and practice at a small firm. While it is true Ray began her career as a litigator in a small firm, that is not relevant in determining whether Ray came within the Plan's definition of disability. Ray's "regular occupation" is defined in the Plan as "the speciality in the practice of law which the insured was practicing just prior to the date disability started." App. at 266, 268 (emphasis added). Our focus then is upon Ray's real estate practice and firm responsibilities as a partner at GD&C and not upon her practice when she began her career.

Because the district court's finding that working in a large office building environment was material to Ray's occupation has factual support in the record and UNUM has failed to dispute this evidence or provide evidence to the contrary, we cannot

conclude that the district court's finding was clearly erroneous.[6]

### 3. *The District Court's Finding that Ray was Totally Disabled*

UNUM advances several arguments for its assertion that the record does not support a finding that Ray is totally disabled. UNUM argues that Ray's symptoms may result from psychiatric factors that have no connection to working in a large building or may stem from her work with alpacas, most of her symptoms were subjective rather than objective, she failed the Plan's requirement of regular attendance of a physician, and violated the Plan with her refusal to attend the IME requested by UNUM. We review the district court's factual findings under the clearly erroneous standard. Anderson, 62 F.3d at 1270. The record supports the factual findings of the district court and UNUM's arguments to the contrary have little to no support in the record. Therefore, we cannot conclude that the district court's finding that Ray was totally disabled was clearly erroneous.

UNUM contends that Ray may suffer from psychiatric problems that cause her symptoms. Ray correctly argues this is speculative and contrary to the evidence. The record supports the district court's finding that Ray's psychologist and psychiatrist both stated that they did not believe Ray's condition was caused by psychiatric or psychological problems, but that her primary frustrations stemmed from her inability to

---

[6] Even if we had decided that this determination was primarily a legal conclusion, rather than a factual finding, and applied de novo review, there is sufficient evidence in the record to support the conclusion that working in a large office building environment is a material duty of Ray's occupation as a major real estate transaction attorney and partner in a large law firm.

continue to work and function as she had. Additionally, the UDC psychiatrist's musings on Ray's traumatic childhood background are mere speculation, rather than medical opinion, and never actually assert that a psychological problem was causing her symptoms. Finally, UNUM's argument that Dr. Schocket suggested a psychiatric-based diagnosis for Ray's symptoms and subsequently referred Ray to a therapist is a mischaracterization of the record. Ray's allergist, Dr. Schocket, listed psychogenic rheumatism as being part of a spectrum of several illnesses within which Ray's ailment falls; he did not diagnose her with this disorder or even suggest she suffered from it. Dr. Schocket referred Ray to a therapist, who found no "identifiable psychological condition which could explain [Ray's] intolerances." App. at 535.

UNUM's argument that Ray's symptoms may stem from her work with alpacas is completely meritless. The record reveals that Ray's symptoms predated her work with alpacas by at least a year, Ray is only around alpacas occasionally, and there is no evidence that exposure to alpacas causes symptoms similar to those Ray experiences in large office buildings. Similarly, its argument that the record lacks objective evidence of disability fails. The district court was permitted to consider subjective, as well as objective, evidence of Ray's disability. We permit consideration of subjective evidence of disability in ERISA cases. See e.g., Clausen v. Standard Ins. Co., 961 F. Supp. 1446, 1456 (D. Colo. 1997) (noting that insurer's attempt to ignore a diagnosis of chronic fatigue syndrome and to instead require objective evidence of distinct physical disease violates established law in circuit).

Finally, the district court properly found that Ray satisfied the Plan's requirement of regular attendance of a physician and that her refusal of the IME did not violate an express provision of the Plan. Ray consulted with numerous physicians on many occasions after the onset of her symptoms. These doctors eventually informed her there was nothing more they could do for her and her best treatment option was to avoid buildings that provoked her symptoms. Based on this, it makes little sense for Ray to see these physicians on a regular basis; she confirmed that she sees them when necessary. Additionally, UNUM cannot assert that Ray's refusal to attend the IME violated the Plan.[7] The record reveals only that the IME was requested, but provides no indication that UNUM presented it as mandatory. Because the record supports the district court's finding that Ray was totally disabled, we cannot conclude that this finding was clearly erroneous.

*4. District Court's Award of Future Benefits*

UNUM argues that the only available remedy to Ray was "benefits due . . . under the terms of [her] plan" and the district court's award of future benefits was erroneous. Ray asserts that the award was proper because remedies are within the discretion of the trial court and 29 U.S.C. § 1132(a)(1)(B) authorizes a civil action not only for "benefits

_____

[7] The Plan states that:

The Company, at its own expense, will have the right and opportunity to have an employee, whose injury or sickness is the basis of a claim:

1. examined by a physician, other health professional, or vocational expert of its choice. App. at 278.

-27-

due," but also "to enforce [a beneficiary's] rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Because we have already concluded that the district court's award of future benefits was proper, this argument is without merit and fails.

*F. Award of Attorney Fees*

Finally, UNUM appeals the district court's award of attorney fees. Courts should not grant attorney fees under ERISA as a "matter of course," but reasonable fee awards are discretionary in nature. McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1209 (10th Cir. 1992). In deciding whether to exercise its discretion and award fees, a district court should consider the following nonexclusive list of factors: (1) the degree of the offending party's culpability or bad faith; (2) the degree of the ability of the offending party to satisfy an award of attorney fees; (3) whether an award of attorney fees against the offending party would deter other persons acting under similar circumstances; (4) the amount of benefit conferred on members of the plan as a whole; and (5) the relative merits of the parties' positions. Deboard v. Sunshine Min. and Ref. Co., 208 F.3d 1228, 1244 (10th Cir. 2000). These five factors "are merely guidelines, and while courts need not consider each factor, no single factor should be held dispositive." McGee, 953 F.2d at 1209, n.17.

We review a district court's award of attorney fees for an abuse of discretion. Deboard, 208 F.3d at 1244. "Under this standard, we will reverse only if we have a definite and firm conviction that the district court made a clear error of judgment or

exceeded the bounds of permissible choice in the circumstances." Id. The district court determined that UNUM reviewed Ray's claim in bad faith and that an award of attorney fees should deter such conduct in the future, UNUM's denial of Ray's claim was erroneous, and it is undisputed that UNUM has an ability to pay attorney fees. Based on these findings, the district court did not abuse its discretion in awarding Ray attorney fees.

III.

We AFFIRM the district court's award of long-term disability benefits and its award of attorney fees.

Entered for the Court


Mary Beck Briscoe
Circuit Judge

05-1284 & 05-1420, Ray v. UNUM Life Ins. Co. of America

**LUCERO, J.**, concurring.

Given my review of the record, and the highly deferential standard of review of the trial court's opinion, I am counter-intuitively compelled to join the result reached by my respected colleagues in the majority. I write separately because I am troubled by the majority's discussion of the district court's finding that working in a large office building is a material duty of Ray's occupation as an attorney specializing in "major real estate, oil and gas and mining transactions."

UNUM Life Insurance Company of America ("UNUM") issued a Long Term Disability Policy (the "Policy") to the partnership of the national law firm Gibson, Dunn & Crutcher LLP ("GD&C").[1] Under the Policy, claimants must prove they are disabled. In June 1994, Pamela Ray, a partner working in GD&C's Denver office, filed a claim with UNUM alleging that she developed an unidentified physical illness that rendered her

---

[1] The Policy provides:

> When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of the physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the Company proof of continued:
>
> 1.    disability; and
> 2.    regular attendance of a physician.

An insured is disabled under the Policy if "because of injury or sickness the insured cannot perform each of the material duties of his regular occupation." "Regular Occupation" for attorneys is defined as "the specialty in the practice of law which the insured was practicing just prior to the date the disability started."

unable to function as an attorney in her speciality because she could not work in large, high-rise office buildings. After two years of investigation and correspondence with Ray, UNUM denied her claim, concluding that Ray had failed to carry her burden of proof. Particularly, UNUM determined that Ray had failed to show that she could not practice her legal specialty in other environments, such as "at home and most likely [at] sites other than the office where your symptoms began." Ray then filed suit against UNUM in federal district court. She alleged that her specialty was practicing as a "large transaction real estate, oil and gas and mining" attorney, that this work could only be performed at a large law firm, that "large law firms are virtually all located in large office buildings," and that she could not tolerate such environments. More than ten years of litigation over UNUM's decision has preceded this appeal.

The district court held a bench trial pursuant to Federal Rule of Civil Procedure 52, and made the following findings in favor of Ray: (1) Ray's specialty was "major real estate, oil and gas and mining transactions"[2]; (2) Ray "could not continue to practice in

_____

[2] Although UNUM casually asserts that the district court cited no authority for defining her specialty so narrowly, UNUM has failed to cite a single case substantiating its argument such that we could declare it clearly erroneous. See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995) (holding that issues not adequately briefed will not be considered on appeal). Upon review, however, I note that in general attorneys' specialties for insurance purposes have not been defined based on the size and complexity of the matters on which they worked. Moreover, I have not discovered any circuit case wherein courts have permitted such a narrow definition of specialty in the legal field. See, e.g., Blaske v. Provident Life & Accident Ins. Co., 162 Fed. App'x 943, 947 (11th Cir. 2006) (unpublished decision) ("litigation attorney"); Heffernan v. UNUM Life Ins. Co. of Am., 101 Fed. App'x 99, 106 (6th Cir. 2004) (unpublished decision) ("litigation attorney"); Lain v. UNUM Life Ins. Co. of Am., 279 F.3d 337, 340 (5th Cir.

(continued...)

-2-

her 'specialty' with GD&C from her home or some other office location"; (3) "[T]he ability to function in a large office building environment is itself a material duty of Plaintiff's regular occupation"; and (4) "[E]ven if she could [find equivalent employment], the types of law firms which practice in [Ray]'s specialty are typically located in large office buildings." Accordingly, the court found that Ray was disabled under the Policy and ordered UNUM to pay benefits.

As the majority correctly notes, we review these findings for clear error. See Anderson v. Comm'r, 62 F.3d 1266, 1270 (10th Cir. 1995). In my view, had UNUM presented any evidence challenging these findings or addressed Ray's evidence in support of such at earlier stages of this litigation, as well as on appeal, I might conclude that the clear error standard has been met. Perhaps UNUM is correct that Ray can work outside large office buildings, but it did not obtain or introduce any evidence from an independent rehabilitation specialist or obtain the opinions of attorneys within her field rebutting Ray's claim that her speciality requires her to work inside a large, high-rise office building. I simply do not deem it appropriate for an appellate court to reject a district court's findings of fact based on a party's uncontested evidence because the finding belies the court's version of common sense. That is a dangerous road, and one I won't travel down here.

---

[2](...continued)
2002) ("real estate, banking, and finance law" attorney); Kerwin v. Paul Revere Life Ins. Co., 6 Fed. App'x 233, 236 (6th Cir. 2001) (unpublished decision) ("trial attorney"); Kearney v. Standard Ins. Co., 175 F.3d 1084, 1086 (9th Cir. 1999) ("trial lawyer").

I am, however, compelled to present a different picture of the evidence. In support of the district court's findings, the majority opinion cites the following evidence: (1) Ray's statements to an UNUM representative; (2) a statement made by George Curtis, the managing partner of GD&C's Denver office, to an UNUM representative; (3) a letter prepared by Karen Clark, a real estate lawyer with GD&C who practices in its Irvine, California office; and (4) a letter prepared by Robert Brown, a real estate lawyer and partner with Sherman & Howard, a Denver-based law firm. Read together, these statements and letters form a web of internal contradictions, and shed little light on whether Ray is genuinely unable to function as an attorney within her field due to her illness.

With respect to whether Ray could practice her specialty in a smaller office location or at home, my colleagues cite three pieces of evidence that provide "substantial" support for the district court. First, Curtis states that having Ray work at home was not acceptable to GD&C because she was unable to "interact with the attorneys and associates for research and training" and because she was unavailable to her clients. Second, Clark notes that "it would be difficult, if not impossible to run a [GD&C] partners' practice from home." Third, Brown stresses that physical proximity is critical for real estate lawyers because of the constant need for timely communication as well as client perception, and that Ray could not realistically perform her role as a real estate partner at GD&C at home or from a remote location.

I am highly skeptical that his evidence demonstrates that Ray cannot function in

-4-

her specialty outside of large office buildings. The state of the record leads me to believe that a lawyer practicing Ray's specialty can do so at a location other than one of the law firm's primary offices. Ray's attorney witness Clark herself practices at one of GD&C's satellite offices. Clark notes that her work often involves interaction with lawyers from multiple GD&C offices, but gives no indication that she is handicapped in those interactions by her location. Witness Brown recognizes that the "information super highway" – fax machines, email, telephones, computers, etc. – has made it easier to practice at remote locations. Although Brown downplays the ability of real estate lawyers working on large transactions to utilize these technologies, and notes that physical proximity is ideal, he expressly recognizes that some individuals function as real estate attorneys from remote locations. Curtis notes "Ray's cases and clients have been dispersed to an associate and one lawyer in the Denver office and one in the Orange County [Irvine] office." Thus, even if Ray's practice were entirely comprised of referrals from Denver lawyers (a limitation not evidenced by the record), this evidence demonstrates it is possible for Ray's work to be performed elsewhere. Ray concedes that she was able to substantially function as an attorney at home, although the at-home arrangement was not acceptable to GD&C.

UNUM continually stated in its correspondence with Ray that her practice at GD&C and her position as a partner with that firm is not insured; only her capacity to function in her specialty is insured. See, e.g., Bendixin v. Standard Ins. Co., 185 F.3d 939, 944 (9th Cir. 1999) (holding a plan administrator was within its discretion to deny

the individual's disability claim as a matter of law where the evidence showed that claimant could work in her "own occupation" with another employer). I agree that whether Ray can continue to work as a partner at GD&C is irrelevant. However, anomalously, UNUM did not advance an iota of evidence on point to rebut the questionable evidentiary basis of Ray's claim that she could not work outside the office environment.

With respect to whether she could obtain equivalent employment at another firm, again the evidence does not easily lend itself to Ray and the majority's interpretation. Brown opines that "[i]f Ms. Ray were to move to another firm to conduct her practice, [the source of her business, i.e. GD&C partners and referrals] . . . would immediately disappear." Clark states that Ray's complex real estate "practice is not easily transportable and equivalent employment would be difficult if not impossible to find."

Clark's letter, however, reveals the reason Ray would have difficulty finding another position in her specialty is that Ray's billing rate is "above the local rates, [and thus] it is difficult to develop clients from the local community." For this reason, Clark concludes, "much of our work depends on our being available to our partners." Clark does not discuss whether Ray could find employment at another firm or obtain her own clients if she were to bill at a lower rate. Moreover, although it may be true that Ray will not receive referrals from GD&C partners if she departs from GD&C, there is no evidence that she would not gain referrals from partners at whatever law firm she would join, or even obtain local clients. Ultimately, both the district court and the majority have

-6-

accepted, without comment, Ray's claim that she must be considered disabled so long as she is precluded from obtaining similar employment at an equivalently inflated salary. To me, an individual's unwillingness to accept a lower salary because she currently charges a premium above local market rates is simply not a basis for declaring that individual disabled. Again, UNUM fails to advance this point in its briefs, or present any evidence that Ray would be able to obtain any other employment in her field. Both Brown and Clark argue that Ray would be unable to find alternate employment with a "substantial law firm" because none of her clients would follow her to another firm. However, they are contradicted by Ray's own admission to UNUM that, upon her departure, some of her clients and customers left GD&C and hired other lawyers.

There is also the matter of whether all firms that practice in Ray's specialty are located in large office buildings. On this point, the majority and district court conflate the need for the resources of a large firm with the claimant's presence in one of the main offices of the firm. For example, the majority states that "[a]lthough all large law firms may not be located in downtown large office buildings or high-rises, large law firms must be located in buildings large enough to accommodate their many employees." (Maj. Op. at 24.) Even assuming that Ray needs the resources of a large law firm to practice her specialty, the majority ignores the prevalence of large firm satellite offices, such as that occupied by Clark, who practices in GD&C's Irvine, California office. Moreover, I am highly skeptical that every lawyer practicing in complex real estate transaction work does so in a large law firm in a large office building.

Notwithstanding the crippled nature of the plaintiff's case, on deferential consideration of the trial court findings based on this hopelessly one-sided record, I am compelled to join in the result reached by the majority. Despite several suggestions by its employees, UNUM never attempted to determine the nature of Ray's specialty, or look into whether she could function in this specialty outside of a large office building. Specifically, UNUM never obtained the opinion of other lawyers practicing Ray's specialty or sought the opinion of a vocational rehabilitation specialist with knowledge of the material duties of her specialty.[3] Instead, from the outset, UNUM denied Ray's claim on the ground that she could <u>probably</u> work from home. The senior claims analyst at UNUM charged with reviewing Ray's file conceded that it was "probably true" that Ray could not work from home. Although there are substantial evidentiary challenges that could have been advanced, UNUM never engaged in a meaningful confrontation with that evidence. Before us, UNUM does not even address Ray's evidence regarding the district court's factual findings before finally joining issue in its reply brief, where it briefly attempts to refute Curtis' statement.[4]

---

[3] <u>Compare</u> <u>Reeve v. UNUM Life Ins. Co. of Am.</u>, 170 Fed. App'x 108, 110-111 (11th Cir. 2006) (unpublished decision) (noting that before denying the claim, UNUM "performed a labor market survey" to determine the material duties of claimant's occupation and obtained the opinion of a "vocational rehabilitation consultant") (unpublished decision); <u>Heffernan v. UNUM Life Ins. Co. of Am.</u>, 101 Fed. App'x 99, 105 (6th Cir. 2004) (unpublished decision) (noting UNUM conducted a labor market survey to determine the material duties of a "litigation attorney" before denying the claim).

[4] This is not to say UNUM mounted no challenge to Ray's claim that working in a
(continued...)

UNUM denied Ray's claim on the basis that she could function as a "major real estate, oil and gas and mining transaction" attorney outside a large office building environment without demonstrating what that role requires. Faced as I am with the uncontroverted state of the record before me, I am compelled to agree that we must affirm.[5]

---

[4](...continued)
large office building was a material duty of her specialty. It relied upon statements made by its medical examiners that Ray had "work capacity" because she could likely perform the functions of her occupation at home or at another location. However, as the district court correctly noted, "[n]one of the physicians or other persons reviewing [Ray]'s claim on behalf of UNUM demonstrated any understanding of 'each of the material duties of her regular occupation.'"

UNUM also argued that Ray could plainly practice her specialty at a smaller firm because she worked as a partner at such a firm before she joined GD&C. The majority rejects this argument on the ground that the Policy ensures her ability to function in the specialty she practiced at the time she became disabled, thus the "focus is upon Ray's real estate practice and firm responsibilities as a partner at GD&C and not upon her practice when she began her career." (Maj. Op. at 25.) Once again, the majority misunderstands the inquiry. The focus of our analysis is whether UNUM was correct in determining that Ray could function as an attorney practicing her specialty at another location. To the extent that Ray practiced her specialty at a small local firm before joining GD&C, I find it highly persuasive with respect to whether she could continue her practice elsewhere. However, because Ray's specialty as defined by the district court includes "major real estate . . . transactions," and there is no evidence she performed real estate work before joining GD&C, her prior work experience does not go toward her ability to perform her specialty elsewhere.

[5] As a general matter, UNUM's ill-advised concessions throughout this dispute coupled with its lack of careful attention to the factual record provides its downfall. In the words of Charles Dickens: "Now what I want is, Facts . . . . Facts alone are wanted in life. Plant nothing else, and root out everything else." Charles Dickens, Hard Times 1 (1854).