**Michael KAFERLY, Plaintiff,**

**v.**

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**Civil Action No. 14-cv-3504-WJM-CBS**

United States District Court,
D. Colorado.

Signed May 31, 2016

Shawn E. McDermott, McDermott Law, LLC, Denver, CO, for Plaintiff.

Jack M. Englert, Jr., Holland & Hart, LLP, Greenwood Village, CO, for Defendant.

## ORDER REVERSING DENIAL OF BENEFITS

William J. Martínez, United States District Judge

In this case brought pursuant to 29 U.S.C. § 1132(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), Plaintiff Michael Kaferly ("Plaintiff" or "Mr. Kaferly") challenges the decision of Defendant Metropolitan Life Insurance Company ("Defendant" or "MetLife") to terminate his long-term disability ("LTD") insurance benefits.

Now before the Court is Plaintiff's Amended Motion for Summary Judgment (ECF No. 30) and the parties' Joint Motion for Determination (ECF No. 57). The disputed issues include whether to set aside MetLife's determination that Plaintiff did not meet the relevant definition of being disabled and, if he did have an otherwise qualifying disability, whether it was due to a "neuromuscoloskeletal and soft tissue" condition which would cap benefits after 24 months. To resolve those issues, the Court must first address what standard of review to apply to MetLife's determinations subject to ERISA review.

For the reasons set forth, the Court concludes that the appropriate standard of review is *de novo*. Applying that standard, the Court concludes that the record shows Mr. Kaferly was disabled at all relevant times and that his condition is not subject to the neuromusculoskeletal limitation. The Court will therefore grant Plaintiff's Motion for Summary Judgment (ECF No. 30) and enter judgment for Plaintiff.

## I. BACKGROUND

Plaintiff was employed by Rotary International ("Rotary") as a Senior Network Analyst starting December 17, 2007. (Administrative Record ("R") (ECF No. 40) at 76.) His responsibilities included administering and coordinating Rotary's email and network systems. (R. at 4095–96.) As a Rotary employee, he was eligible for employee benefits including long term disability coverage ("LTD" or "LTD benefit") under a plan provided by MetLife (the "Plan"). MetLife was both the Plan Administrator and the Plan Sponsor (R. at 56; ECF No. 38 at 12), and responsible for review and determination of an appeal from an adverse claim determination (R. at 59–60). MetLife also issued a group insurance policy (the "Policy" or "Insurance Policy") to Rotary to fund the LTD benefits provided by the Plan. (R. at 4, 56; ECF No. 38 at 12; ECF No. 50 ¶ 6.)

On September 14, 2008, Plaintiff was prescribed the antibiotic Levaquin, in preparation for a surgery. (R. at 2362, 3132.) Soon after, he began to experience a variety of unusual symptoms including pain, fatigue, difficulty walking, and various neurological symptoms. (R. at 2727–31, 2241, 4132.) These problems did not resolve following surgery, and eventually led to a lengthy period of seeking treatment and diagnosis and to a wide variety of symptoms. As summarized in this case, his overarching diagnosis is of "autonomic peripheral neuropathy and mitochondrial dysfunction secondary to fluoroquinolone toxicity from his use of Levaquin in 2008." (ECF No. 30 at 2.) The longer history of symptoms he has experienced includes cognitive impairment including lack of concentration, confusion, memory loss, and "brain fog," blurry vision, double vision/diplopia, joint pain, lower extremity tingling, balance impairment, generalized pain and weakness, fatigue, muscle atrophy, marked weight loss, and fevers.[1] At least in part because the side effects of Levaquin, including mitochondrial compromise, were not well understood in 2008,[2] his history of testing, treatment, and diagnoses is also lengthy. At various times since 2008, his doctors have diagnosed autonomic neuropathy, Guillain-Barre syndrome, chronic myopathy, paresthesia, chronic fatigue syndrome, fluoroquinolone toxicity, and acquired mitochondrial dysfunction/disorder of mitochondrial metabolism.[3]

Approximately two months after surgery, Rotary suggested that Plaintiff apply for short term disability benefits, given his symptoms. (ECF No. 30 at 6.) His last day of work was November 26, 2008. (R. 67.) In December 2008, Plaintiff's primary care physician, Dr. Jeffrey Jackson, M.D., completed materials for Plaintiff's application for short-term disability benefits from MetLife, noting an "objective finding" of "inability to walk due to severe muscle weakness [and] neuropathy," and noting "no work at all" for Mr. Kaferly. (R. at 3148.) MetLife approved Mr. Kaferly's application for short term disability benefits as of December 4, 2008. (R. at 4232–32.) In May 2009, Dr. Jackson submitted follow-up materials supporting Plaintiff's continued eligibility for short term disability benefits. (R. at 4092.) He identified polyneuropathy and fatigue as primary and secondary diagnoses. (Id.)

Plaintiff's claim was transitioned to LTD status by MetLife in 2009. (R. at 64 & 4091.) MetLife approved Plaintiff's LTD benefits payable as of May 26, 2009, noting "[y]ou became disabled on November 27, 2008." (R. at 4042–43.)

Plaintiff continued to receive treatment and seek a more definitive diagnosis for his condition and symptoms. On July 8, 2010, he consulted Dr. David Perlmutter, M.D., who opined that Mr. Kaferly's symptoms, including dysesthesia, parasthesia, hypoesthesia, pain, and muscle weakness had been associated with fluoroquinolone toxicity, and that Levaquin exposure was indeed noted in Plaintiff's history. (R. at 3558–59.) This appears to be the first diagnosis linking Plaintiff's symptoms with Levaquin use. Dr. Perlmutter prescribed treatments for this diagnosis. (Id.)

---

1. See ECF No. 30 at 21–22 (table listing symptoms described and record citations to clinical records).

2. On May 12, 2016, the FDA updated its warnings for fluoroquinolone antibiotics, including Levaquin, noting that "fluoroquinolones when used systemically . . . are associated with disabling and potentially permanent serious side effects that can occur together. These side effects can involve the tendons, muscles, joints, nerves, and central nervous system." FDA Drug Safety Communication (May 12, 2016), available at http://www.fda.gov/Drugs/DrugSafety/ucm500143.htm.

3. See ECF No. 30 at 24–25 (table listing diagnoses and record citations to clinical records).

Plaintiff continued to receive treatment and further diagnoses suggesting his condition was caused by fluoroquinolone toxicity. For example, on March 2, 2011, one of Mr. Kaferly's treating physicians, Dr. Jia Gottlieb, M.D., completed documentation for MetLife indicating that Mr. Kaferly's primary diagnosis was fluoroquinolone toxicity, that he was disabled and unable to perform job duties, and that his expected improvement was uncertain. (R. at 3934–35.)

The LTD benefit award provided that MetLife would "periodically require updated medical information" and would contact Mr. Kaferly and/or his physicians to obtain that information. (R. at 4044.) In June 2011, one of MetLife's claim specialists spoke with Plaintiff, and he advised that after years of misdiagnosis, he had received a diagnosis of mitochondrial disease related to his multiple symptoms and conditions. (R. at 166.) In August 2011, one of MetLife's nurse consultants reviewed the file and interviewed Plaintiff, noting that he "was extremely knowledgeable regarding [his] condition," and that the "[c]laim is extremely complicated and needs evaluation by [an] expert in the field." (R. at 175–77.) Follow-up claim notes commented that "[m]edical [information] is not very in depth," suggested an independent medical exam (IME), and referred the claim to a MetLife investigation unit. (R. at 177.)

MetLife's investigation included hiring an investigation company to conduct surveillance of Plaintiff, and seeking an IME. A first IME was scheduled for January 18, 2012. (R. at 202.) Plaintiff appeared for this exam but it was canceled, either by MetLife or by the examining physician.[4] A second IME was scheduled for February 3, 2012. (R. at 203.) Mr. Kaferly did not appear for this IME and MetLife did not seek to reschedule it. (R. at 204; ECF No. 30 at 12, 31–32.)

MetLife then terminated LTD benefits, by letter dated February 28, 2012, stating that "[b]ased on the medical documentation on file, the information provided is considered subjective in nature," and "there is not any current medical evidence [of] functional impairment provided to support your inability to perform the duties of your own occupation .... Therefore, no further benefits are payable beyond February 28, 2012." (R. at 3868–69; ECF No. 40-28 at 13–14.) In addition, the termination letter noted that Mr. Kaferly had not attended the February 3, 2012 IME and that the plan "states Monthly Benefits will end on ... the date you fail to attend a medical examination requested by us." (R. at 3868.)

Plaintiff appealed from MetLife's termination, by a letter dated June 19, 2012. (R. at 220.) He submitted additional supporting medical materials including medical records and a letter from Dr. Perlmutter reiterating that he "believe[d] that this gentleman is suffering from an acquired mitochondrial dysfunction possibly as a consequence of Levaquin exposure (fluoroquinolone toxicity) ... this patient should be considered completely disabled from any gainful employment." (R. at 3848–49.)

MetLife conducted a review of Mr. Kaferly's appeal, including a review of medical records by an independent reviewer (R. at 3830–39), Dr. Wolf, who described certain functional limitations and restrictions arising from some of Plaintiff's conditions and symptoms (R. at 3837). Her review was provided to his treating physicians and a MetLife vocational specialist. Dr. Perlmutter responded describing the review as being overall "factual and rational," but maintaining his opinion that Mr. Kaferly "indeed has an acquired mitochondropathy as a consequence of fluoroquinolone exposure," noting that these issues "are rela-

---

4. The parties dispute who canceled the IME. *See infra* at § III.B.2.

tively newly described," and concluding that "based upon the peer-reviewed literature ... the previously described limitations in terms of functional requirements ... should be validated." (R. at 3766–67.) MetLife's vocational consultant concluded that Plaintiff "would be able to do his own job" based on the limitations described by Dr. Wolf. (R. at 245.)

On September 12, 2012, MetLife issued a determination affirming its termination of LTD benefits. (R. at 3758–64.) MetLife concluded that "the medical documentation did establish that you had some restrictions and limitations ... [but] these restrictions and limitations did not demonstrate that you were unable to perform your own job and therefore your own occupation beyond February 28, 2012 .... Therefore, we have determined that you did not meet the Plan's definition of Disability." (R. at 3763.) MetLife also noted that Mr. Kaferly's LTD Beneifts were subject to termination on the date he failed to attend an IME (February 3, 2012). (Id.) In addition, the appeal determination concluded that the limitations Mr. Kaferly had demonstrated were "based on a condition that is limited to 24 months of benefits," citing a Plan limitation applicable to "neuromusculoskeletal and soft tissue" disorders (the "NMS Limitation"), providing this as an alternative ground to terminate benefits. (Id.)

At some point after this denial of his appeal, Mr. Kaferly hired a lawyer to represent him. On October 30, 2013, his lawyer wrote to MetLife, arguing that reliance on the NMS Limitation in the appeal determination had improperly presented an issue not raised in MetLife's initial termination letter, and requesting that MetLife reopen Plaintiff's claim and allow a secondary appeal. (R. at 3742–43.) MetLife agreed to an additional appeal, which MetLife said would be limited to the issue of the NMS Limitation. (R. at 3732, 3739.)

On June 17, 2014, Plaintiff's lawyer filed a second appeal, contesting all aspects of MetLife's decision to terminate LTD benefits, including but not limited to the issue of the NMS Limitation, and submitting extensive supporting materials. (R. at 3696–3723.) MetLife did not object to the scope or presentation of this second appeal. It initiated a second appeals review determination, not limited in scope to the NMS Limitation. As part of this appeal review, MetLife conducted two IMEs, by a neurologist and a neuropsychologist, in August and September 2014. (R. at 1070–1150, 1175–89.)

After completion of the two IMEs, those reports were forwarded to Plaintiff's physicians for review and comment, in November 2014. Dr. Perlmutter reiterated that "Mr. Kaferly has sustained a compromise of mitochondrial function as a direct result of fluoroquinolone exposure ... [he] should be considered totally disabled from meaningful employment as a result." (R. at 448.) Another of Plaintiff's treating physicians, Dr. Ivker, wrote that "Mr. Kaferly is the most severely disabled patient I have treated in more than 42 years of practice." (R. at 537.)

In December 2014, Plaintiff demanded that MetLife deliver a final appeal determination, noting that the deadlines for review and determination under ERISA regulations had passed. (R. at 366-67.) MetLife indicated that its review was ongoing. (R. at 407–08.) Plaintiff asserted that the review was "deemed exhausted" pursuant to ERISA review, and filed this lawsuit on December 30, 2014. (R. at 361–63.) MetLife never completed a final appeal determination on the second appeal.

## II. LEGAL STANDARD

### A. Procedural Posture

 Parties may present a dispositive motion in an ERISA case such as this one

either as a motion for a bench trial on the papers or as a motion for summary judgment. *See Jewell v. Life Ins. Co. of N. Am.*, 508 F.3d 1303, 1307 n. 1 (10th Cir.2007), *cert denied*, 553 U.S. 1079, 128 S.Ct. 2872, 171 L.Ed.2d 811 (2008). Here, Plaintiff filed a motion for summary judgment, but the usual posture of Federal Rule of Civil Procedure 56 does not apply. Rather, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir.2010) (internal quotation marks omitted). In this way, "where the parties have not disputed the completeness of the Administrative Record ... this Court treats the case as presenting cross-appeals under Fed. R. at App. P. 28.1," and resolves the case on the pending papers. *Sullivan v. Ltd. Brands, Inc. Long–Term Disability Program*, 2008 WL 659641, at *1 n. 2 (D.Colo. Mar. 5, 2008).

## B. Standard of Review

▮ As a threshold matter, the parties dispute what standard of review the Court should apply. In ERISA cases challenging denial of employee benefits, the default standard of review is *de novo*, un-

less the insurance policy or benefit plan contains an express provision granting discretionary authority to the administrator, in which case courts apply only an arbitrary and capricious standard of review. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Here, the Plan contains such a provision (the "discretionary clause"), providing that the Plan Administrator has "discretionary authority ... to determine eligibility for and entitlement to Plan benefits," and that the Administrator's determinations "shall be given full force and effect, unless ... arbitrary and capricious." (R. at 60-61.)[5]

MetLife and Mr. Kaferly agree that *de novo* review applies to Plaintiff's second appeal, because there was no final determination made on that appeal. (ECF No. 30 at 28–29 & ECF No. 38 at 22, 27–28.) As discussed further below, however, the parties strongly dispute what issues are subject to review from that second appeal.

Regarding MetLife's 2012 decision to terminate Mr. Kaferly's LTD benefits, and its decision on Mr. Kaferly's appeal from that decision (*i.e.*, the first appeal), MetLife argues that only arbitrary and capricious review should be applied pursuant to the discretionary clause. (*See* ECF No. 38 at 22.)

▮ Plaintiff argues that the *de novo* standard of review must be applied to his entire challenge, because Illinois insurance regulations make the discretionary clause invalid.[6] Specifically, the Illinois Adminis-

5. The discretionary clause reads as follows:

Discretionary Authority of Plan Administrator and Other Plan Fiduciaries[:] In carrying out their respective responsibilities under the Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpreta-

tion or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.
(R. at 60–61.)

6. Plaintiff argues several different reasons why *de novo* review should apply to all issues. (ECF No. 30 at 28–30.) Because the Court resolves this issue by applying the Illinois

trative Code prohibits such discretionary clauses:

> No policy, contract, certificate, endorsement, rider application or agreement offered or issued in this State, by a health carrier, to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services or of a disability may contain a provision purporting to reserve discretion to the health carrier to interpret the terms of the contract, or to provide standards of interpretation or review that are inconsistent with the laws of this State.

50 Ill. Adm. Code § 2001.3 ("the Regulation" or "Section 2001.3").[7] The purpose of this provision is plain: "[t]he *raison d'etre* for Section 2001.3 is to protect consumers from having their benefits determinations reviewed under an arbitrary and capricious standard." *Zaccone v. Standard Life Insur. Co.*, 2013 WL 1849515, at *3 (N.D.Ill. May 1, 2013); *see also id.* ("courts in this District have uniformly recognized that the purpose of Section 2001.3 is to ensure that *de novo* review would be the standard in ERISA cases when a denial of benefits is challenged").

MetLife argues, however, that this provision is inapplicable because the Plan was already in effect when the Regulation was adopted and it does not apply retroactively. Specifically, the effective date of the Plan was June 1, 1999 (R. at 4), but Section 2001.3 did not come into force until July 1, 2005 (ECF No. 38 at 24; 29 Ill. Reg. 10172, effective July 1, 2005).

Plaintiff argues that although the Plan became effective in 1999, the insurance Policy issued by MetLife to fund and enable the benefits Plan was renewed annually, and that the Regulation applies to any insurance document renewed after July 1, 2005. Further, Plaintiff notes that he was first employed by Rotary on December 17, 2007, more than two years after the effective date of the statute. Thus, he argues, the individual coverage as to Plaintiff could not possibly have been in effect until after the Regulation's effective date.[8]

MetLife responds that although the insurance Policy has renewed annually, the terms and conditions of the benefits Plan never changed until its termination in 2009, and that the Regulation cannot apply retroactively to these terms. MetLife does not dispute that the Regulation applies to benefits plans in general and would apply to the Plan here, if it had been issued or renewed after July 1, 2005.

MetLife cannot escape the application of the Illinois Regulations, regardless of whether the discretionary clause was located in the benefits Plan itself or the Insurance Policy that annually funded and enabled the Plan. MetLife similarly sought to rely on the distinction between Plan and Policy documents in *Fontaine v. Metropolitan Life Ins. Co.*, 800 F.3d 883 (7th Cir.2015), in which the Seventh Circuit rejected the distinction as "too-clever," and an "artificial distinction." *Id.* at 887, 888. In *Fontaine*, MetLife argued that Section 2001.3 was not a provision that "regulates insurance" (and therefore was not saved from federal preemption under the ERISA savings clause, 29 U.S.C.

Regulation, it does not address the other arguments.

7. The parties agree that Illinois law governs. Plaintiff resided in Illinois when his claim arose and notes that the policyholder situs is Illinois. (ECF No. 56 at 2; R. at 4258).

8. Under the Policy, MetLife was to "furnish certificates to the Employer for delivery to each Employee who is insured." (R. at 4252; ECF No. 49-1 at 5.) Although neither party cites to an individual certificate for Mr. Kaferly in the administrative record, MetLife does not (and cannot) dispute that such benefits coverage for Mr. Kaferly only initiated after his date of hire.

§ 1144(b)(2)(A)). One of MetLife's arguments was that "the discretionary clause . . . is not actually in an insurance policy but in an ERISA plan document." *Id.* at 887. The Seventh Circuit concluded that "[w]hether a provision for discretionary interpretation is placed in an insurance policy or in a different document is arbitrary and should make no legal difference." *Id.* at 888. The court further reasoned that if MetLife's position were correct "then states 'would be powerless to alter the terms of the insurance relationship in ERISA Plans; insurers could displace any state regulation simply by inserting a contrary term in plan documents." *Id.* (quoting *UNUM Life Ins. Co. v. Ward,* 526 U.S. 358, 376, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999)). Thus the Seventh Circuit concluded that "the artificial distinction that MetLife draws between ERISA plan documents and insurance policies, which are linked together so closely, has no basis in either law or common sense," and that the Regulation applied to both Plan and Policy documents. *Id.* at 888.

The same logic that applied in *Fontaine* controls here. MetLife's "artificial distinction" between the Plan and the Policy documents is "too clever," *Fontaine,* 800 F.3d at 887, and giving legal effect to that distinction would leave states "powerless to alter the terms of the insurance relationship in ERISA Plans," *id.* at 888, because insurers could continue to enforce prohibited pre-1995 discretionary clauses indefinitely while renewing the insurance policies that enable those plans. Like the Seventh Circuit in *Fontaine,* this Court declines to apply a rule of law that would allow insurers to evade the obvious purpose of Section 2001.3 by means of clever drafting. *Cf. id.* at 888; *see also Novak v.*

*Life Ins. Co. of N. Am.,* 956 F.Supp.2d 900, 906 (N.D.Ill.2013) ("Courts in this district have rejected the argument that § 2001.3 does not apply by virtue of the fact that the language conferring discretion appears only in the plan document and not in the insurance policy itself") (citing cases).

MetLife argues that its settled contract interests would be improperly disturbed by retroactive application of the Regulation, citing *Mustain–Wood v. Northwestern Mutual Life Ins. Co.,* 938 F.Supp.2d 1081, 1085 (D.Colo.2013), in which this Court addressed whether Colorado's comparable ban on discretionary clauses, Colo. Rev. Stat. § 10-3-1116(2)–(3), applied to an insurance policy that had been issued before the statute's effective date but renewed after. In *Mustain–Wood,* the Court concluded that later renewal of the policy renewal did not make the statute applicable in those circumstances:

> To apply [§ 10-3-1116] to a plan that was issued 13 years prior to the statute's effective date would impose new obligations and restrictions on the parties . . . . If renewal of a policy automatically incorporates any and all statutes affecting a policy which were not in effect at the time of the policy's issuance, then at the time of issuance, neither party can reasonably be expected to know its obligations under a policy that may or may not be automatically altered at some future date based on the whim of Colorado's legislature . . . . [The Court] find[s] that renewal of the policy does not automatically render it susceptible to the terms and conditions found in Colo. Rev. Stat. § 10-3-1116[.]"

938 F.Supp.2d at 1085.[9] MetLife argues that this same reasoning should control

---

**9.** MetLife also cites *Hollingshead v. Stanley Works Long Term Disability Plan,* 2012 WL 959402 (D.Colo. Aug. 3, 2011). In *Hollingshead,* the undersigned concluded that Colo.

Rev. Stat. § 10-3-1116 did not apply retroactively, but there was no contention the statute had become applicable because of a renewal. *Id.* at *2.

here. (*See* ECF No. 53 at 5 (citing *McClenahan v. Metro. Life Ins. Co.*, 621 F.Supp.2d 1135, 1142–43 (D.Colo.2009) ("[r]etroactive application of [§ 10-3-1116] would alter significantly [the parties'] defined obligations and duties and would, in effect, create new and enhanced obligations and duties for MetLife")).)

One answer to this argument is that MetLife's contractual obligations remained settled up to the first renewal of the insurance Policy, at which point MetLife had ample notice of the Regulation's new requirements and an opportunity to renegotiate Plan and/or Policy terms, including by adjusting premiums.[10] The fact it chose not to alter any terms or raise rates confirms the untenable potential for MetLife's Plan/Policy to allow insurers to indefinitely postpone compliance with new insurance regulations.

■ The other problem for MetLife, fatal to its position, is that while its argument relies on general principles regarding retroactive application of statutes and this Court's decisions regarding Colorado's ban on discretionary clauses, well-settled Illinois law forecloses MetLife's position. "Section 2001.3 does not apply retroactively to ERISA plans established before the regulation's effective date. It does, however, apply . . . to plans issued *or renewed* after July 1, 2005." *Zaccone*, 2013 WL 1849515, at *5 (emphasis in original) (citing, *inter alia*, *Golden v. Guardian Life Ins. Co. of Am.*, 2010 WL 3951508, at *1 (N.D.Ill. Oct. 4, 2010), and quoting *Garvey v. Piper Rudnick LLP Long Term Disability Ins. Plan*, 2011 WL 1103834, at *2

(N.D.Ill. March 25, 2011) ("[d]ecisions from this District consistently have held that Section 2001.3 applies only to plans issued or renewed after July 1, 2005")).

■ This conclusion follows from longstanding principles of Illinois law. "[W]ell settled Illinois law . . . has addressed the legal effect of renewing an insurance policy. 'In Illinois, the renewal of an insurance policy is generally conceived to be a new contract.' " *Zaccone*, 2013 WL 1849515, at *6 (quoting *Am. Auto Guardian, Inc. v. Acuity Mut. Ins. Co.*, 548 F.Supp.2d 624, 628 (N.D.Ill.2008)).[11]

■ In addition, renewal of insurance under Illinois law acts to incorporate thencurrent statutes and regulations into the insurance contract. "When an insurance policy is issued or renewed, applicable statute provisions in effect at the time are treated as part of the policy." *Eipert*, 136 Ill.Dec. 973, 545 N.E.2d at 501 (citing *Boyd v. Madison Mut. Ins. Co.*, 146 Ill. App.3d 420, 99 Ill.Dec. 862, 496 N.E.2d 555, 558 (1986) ("statutory provisions applicable to insurance policies which are in effect at the time the policy is issued or renewed are treated as part of the agreement"), *aff'd*, 116 Ill.2d 305, 107 Ill.Dec. 702, 507 N.E.2d 855 (1987)). "Each time a policy is renewed it results in a new contract for purposes of incorporating statutory provisions into the policy." *Eipert*, 136 Ill.Dec. 973, 545 N.E.2d at 501 (citing *Thieme v. Union Labor Life Ins. Co.*, 12 Ill.App.2d 110, 138 N.E.2d 857 (1956)). The rule is also codified by statute. 215 Ill. Comp. Stat. 5/357.23. This established rule

---

**10.** MetLife argues that the Policy renewal was "a formality" and did not include substantive changes, but it acknowledges that the Policy premium changed as of 2002–2003, confirming that it had the opportunity to raise the price of funding the Plan in response to the Regulation, if it chose to. (ECF No. 53 at 4 n.1.)

**11.** *See also Dungey v. Haines & Britton, Ltd.*, 155 Ill.2d 329, 185 Ill.Dec. 520, 614 N.E.2d 1205, 1208 (1993) ("[t]he renewal of a policy is, in effect, a new contract of assurance") (quoting *Palmer v. Bull Dog Auto Ins. Assoc.*, 294 Ill. 287, 128 N.E. 499 (1920), and citing *Eipert v. State Farm Mut. Auto. Ins. Co.*, 189 Ill.App.3d 630, 136 Ill.Dec. 973, 545 N.E.2d 497, 501 (1989)).

·of Illinois law distinguishes this case from *Mustain–Wood. See* 938 F.Supp.2d at 1085 ("If renewal of a policy automatically incorporates any and all statutes . . . neither party can reasonably be expected to know its obligations . . . .").

Applying the above-cited Illinois law, the Illinois. Department of Insurance has explicitly rejected MetLife's position. In a bulletin issued June 28, 2010, the department noted that some insurance companies were continuing to enforce discretionary clauses from policies pre-dating July 1, 2005. (ECF No. 52-1 at 1.)[12] The department stated this was "[t]ypically . . . done under the theory that the regulation has no retroactive application," but stated flatly that "[s]uch conduct does not comply with the law in that it does not properly take into account the renewal of the policy," noting that "[p]olicies offering . . . disability benefits typically are renewed annually," and "[i]t is therefore unlikely that there are any policies in existence that have not been either renewed or issued subsequent to the effective date of the regulation." (*Id.* (citing *Eipert*, 136 Ill.Dec. 973, 545 N.E.2d at 501; *Thieme*, 138 N.E.2d at 860; and *Boyd*, 99 Ill.Dec. 862, 496 N.E.2d at 558).)

It does not appear that the Illinois Supreme Court has directly addressed the issue presented here. However, based on the authority reviewed—including *Fontaine*, multiple cases from the Northern District of Illinois, long-established Illinois law, and the Illinois Department of Insurance's application of that law to this situation—the Court believes that the Illinois Supreme Court would hold Section 2001.3 is applicable in these circumstances, where the Policy has renewed annually since the Regulation's effective date, and Plaintiff himself became eligible for benefits after those renewals. Thus, the discretionary clause is invalid and *de novo* review is appropriate as to this entire dispute.

## III. ANALYSIS

### A. Scope and Status of the Second Appeal

██ The parties dispute the scope of the second appeal and what issues from that appeal are properly presented for the Court's review. According to MetLife, the first appeal involved a "disability definition determination"—*i.e.*, whether Mr. Kaferly met the Plan definition of being disabled. But, MetLife argues, this issue was closed after the September 25, 2012 decision denying Plaintiff's first administrative appeal. (ECF No. 38 at 25.) The second appeal, on which no final determination was reached, was limited *only* to the alternative grounds of the NMS Limitation, according to MetLife. Plaintiff, on the other hand, argues that the disability determination was also at issue in the second appeal.

Even having concluded that *de novo* review applies as to both appeals, this issue matters because MetLife argues that only evidence available as of the first appeal should be considered as to the disability determination. Plaintiff argues that the Court should consider all available evidence on that issue, and that MetLife is improperly "attempting to . . . block evidence that is relevant to the main issue: whether MetLife wrongly terminated benefits." (ECF No. 52 at 12.)

MetLife raised the NMS Limitation for the first time in its determination on Plaintiff's first appeal, presenting it as an alternative grounds for termination. (R. at 3763.) More than a year later, on October

---

12. Ill. Dep't of Ins., Company Bulletin 2010-05, "Prohibition on Discretionary Clauses" (June 28, 2010), *available at* http://insurance. illinois.gov/cb/2010/cb2010-05.pdf; (also filed as ECF No. 52-1).

30, 2013, Plaintiff, through counsel, requested that MetLife "reopen [Plaintiff's] claim and provide him the opportunity to address MetLife's new basis for denying his claim":

> As Part of [its] appeal denial, MetLife asserted for the first time that some of his conditions were limited by the policy's neuromusculoskeletal limitation. MetLife did not provide Mr. Kaferly the opportunity to address its application of this limitation, in violation of ERISA.
>
> * * *
>
> Therefore, in the interest of complying with ERISA and providing Mr. Kaferly with his statutory right to a full and fair review, we are requesting MetLife reopen his claim and provide him the opportunity to address MetLife's new basis for denying his claim.

(R. at 3744–43.)

MetLife responded in a December 19, 2013 "Addendum Letter," stating, in part:

> Because your claim was denied in whole or in part, you may appeal only the decision of the limitation of benefits in regards to your Neuromusculoskeletal conditions by sending a written request for appeal .... Please include in your appeal letter the reason(s) you believe the claim was improperly denied, and submit any additional communications, documents, records or other information relating to your claim that you deem appropriate for us to give your appeal proper consideration .... MetLife will evaluate all the information and advise you of our determination of your appeal
> ....

(R. at 3739.) In a cover letter MetLife also noted, "[w]e are providing additional appeal rights in regards to your client's conditions which were limited by the Plan's neuromusculoskeletal limitation." (R. at 3732.)

Following this letter, Plaintiff initiated a second appeal, on June 17, 2014. (R. at 3695–3723.) Plaintiff's lengthy and detailed appeal submission was in no way limited to the NMS Limitation. The appeal contested virtually every aspect of MetLife's termination of benefits, including the NMS Limitation and the disability determination, and included extensive medical evidence and other supporting materials, mostly from after 2012. (R. at 3697.)

MetLife's argument that the second appeal was limited only to the NMS Limitation finds some support in the parties' 2013 correspondence. As quoted above, MetLife stated an intention to limit the second appeal to the NMS Limitation. (R. at 3732, 3739.) However, this correspondence also gave an open-ended invitation for Plaintiff to submit "any additional ... documents, records or other information ... that you deem appropriate," and promised that "MetLife will evaluate all the information." (R. at 3739.) MetLife also relies on Plaintiff's October 30, 2013 request for a second appeal. But while Plaintiff asked MetLife to "reopen" his claim *because* of the new assertion of the NMS Limitation, he also invoked his "statutory right to a full and fair review," and Plaintiff did not state that the second appeal would then be limited to this issue. (R. at 3742–43.) These communications are therefore not conclusive of whether the second appeal was properly limited to the NMS Limitation.

Moreover, even if MetLife properly limited the second appeal to the NMS Limitation as of 2013, its position before the Court has three fatal flaws.

*First*, MetLife is simply wrong when it states that "the submissions and communications about the new appeal in 2014 and 2015 concerned only the [NMS Limitation]." (ECF No. 38 at 35.) Plaintiff's 2014 submissions comprehensively challenged MetLife's disability determination. Moreover, MetLife's own investigation and response clearly took up this issue. For example, MetLife required two IMEs that

were not limited to the NMS Limitation,[13] it reviewed and addressed records not relevant to the NMS Limitation, and MetLife's own claim file notes that within weeks of receiving Plaintiff's second appeal, MetLife staff had internally ruled out application of the NMS Limitation.[14] Thus, MetLife's own actions were inconsistent with the argument that the second appeal was limited to the NMS Limitation.

Put another way, even if MetLife did originally seek to limit the second appeal to the NMS Limitation, it waived any objection to Plaintiff's *de facto* reopening of all issues by failing to make a timely objection on that basis and instead taking up the appeal to create a record of new medical evidence bearing on the disability determination.

*Second*, the NMS Limitation only applies to claimants who have a disability. Yet MetLife argues it had already concluded that Mr. Kaferly did not. It would make no sense for MetLife to have spent the time, trouble, and expense of investigating Plaintiff's second appeal if there was no possibility that it could change the ultimate determination on his eligibility for LTD benefits. It is not credible that MetLife conducted an appeal review knowing it could not change its ultimate decision.

*Third*, MetLife's argument that it can—and the Court should—ignore most of the evidence in the administrative record that bears on the ultimate issue of entitlement to benefits is inconsistent with its obligations as a fiduciary under ERISA. An ERISA plan fiduciary must " 'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the [plan's] participants and beneficiaries.' " *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) (quoting 29 U.S.C. § 1104(a)(1)) (alterations in original). The fiduciary "has a duty to see that those entitled to benefits receive them. It must consider the interests of deserving beneficiaries as it would its own." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807–808 (10th Cir.2004). Further, "presented with a claim that a little more evidence may prove valid," an ERISA fiduciary "should seek to get to the truth of the matter." *Id.* at 808.

Applying those principles here, MetLife, as Plan fiduciary, can not ignore the bulk of the evidence before it bearing on the disability determination. This is particularly so where MetLife had an active role in creating that evidence. Moreover, MetLife first awarded Plaintiff benefits for over two years, then reversed its determination based, it says, on the then-current evidence. MetLife cannot argue both that it was entitled to rely on updated information in 2012 to terminate benefits, and then that it may ignore the most current information now that it seeks to defend its prior termination.

For these reasons, the Court rejects MetLife's position that the two appeals are fundamentally distinct or that only evidence presented to MetLife as of September 25, 2012 bears on the disability determination. (ECF No. 38 at 39.)

---

**13.** The questions MetLife posed to its IME examiners went beyond whether Plaintiff was covered by the NMS Limitation, also addressing the nature of his limitations and the full scope of his diagnoses. For example, the examiners were asked: "Define current level of functionality ..."; "Provide rationale for any restrictions or limitations you have recommended ..."; and "Address all of the medical evidence in the file in review, in support of the claimant's functional restrictions and limitations." (R. at 319–21, 584–5, 641–43.)

**14.** MetLife's claim file includes a notation by a nurse consultant on July 17, 2014 that "on the second appeal there was a question of a possible LDB [limited disability benefit,] however neuropathy is not considered an LDB.' " (R. at 318.) This appears to be the last mention of the NMS Limitation in MetLife's file.

## B. Termination of LTD Benefits

### 1. Disability Determination

MetLife's 2012 termination of benefits turned primarily on the determination that Mr. Kaferly no longer met the definition of being disabled under the Plan. The terms of that definition relevant here require that Plaintiff "due to sickness ... [was] receiving Appropriate Care and Treatment from a Doctor on a continuing basis and ... [was] unable to earn more than 80% of [his] Predisability Earnings or Indexed Predisability Earnings at [his] Own Occupation for any employer in [his] Local Economy."[15] (R. at 24; ECF No. 40-1 at 24.) The Court concludes that Plaintiff met this definition at all relevant times.

#### a. *Evidence Available as of February 28, 2012 Termination*

As of February 28, 2012, MetLife concluded that "the information provided [by medical documentation] is considered subjective," and that *"there is not any current medical evidence [of] function impairment provided to support your inability to perform the duties of your own occupation[.]"* (R. at 3869 (emphasis added).) Affirming this decision, MetLife reiterated that the "medical documentation did estab-

lish that you had some restrictions and limitations," based on medical conditions, but that "these restrictions and limitations *did not demonstrate that you were unable to perform your own job and therefore your own occupation* beyond February 28, 2012." (R. at 3763 (emphasis added).)

▮ Reviewing the evidence *de novo*, the Court cannot agree with MetLife's conclusion that the available evidence does not demonstrate that Plaintiff was unable to perform his own job. MetLife's decision to terminate benefits was not justified for several reasons, given the evidence in the record.

Notably, MetLife reversed its own June 8, 2009 determination that Mr. Kaferly "became disabled on November 27, 2008" and was eligible for LTD benefits from that time through termination. (R. at 4042–43.) This reversal tends to show that MetLife's termination was improper, absent evidence demonstrating Plaintiff's condition had improved. *See McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir.2002) ("unless information available to an insurer alters in some significant way, the previous payment of benefits ... must weigh against the propriety of ... [the] decision to discontinue those payments").[16]

---

**15.** The complete definition is as follows:
"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
1. during your Elimination Period and the next 60 month period, due to your inability to perform the duties of your Own Occupation you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
2. after the 60 month period, due to your inability to perform the duties of any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability

Earnings, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury.
(R. at 24.)

**16.** *See also Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir.2008) ("MetLife had been paying [claimant] long-term disability benefits for a year, which suggests that she was already disabled. In order to find [claimant] no longer disabled, one would expect [the medical evidence] to show an improvement, not a lack of degeneration."); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir.2001) ("Nothing in the claims record justified [insurer's]

Here, MetLife found that Plaintiff was disabled from November 2008 through at least June 2011.[17] MetLife then initiated a claim investigation and reversed its own eligibility determination only after learning of his diagnosis of mitochondrial disease in June 2011. (R. at 169–70.) On August 5, 2011, MetLife's claim file reflects a telephone interview between a MetLife nurse consultant and Mr. Kaferly, noting that he addressed the diagnosis of mitochondrial dysfunction and described his symptoms; the nurse consultant noted his "[c]laim is extremely complicated and needs evaluation by [an] expert in the field." (R. at 175–77.)[18]

However, MetLife's subsequent termination did not rely on such an expert evaluation. MetLife's claim investigation, beginning in August 2011 (ECF No. 38 at 14; R. at 177) appears to have included the following review actions leading to termi-

nation: (1) MetLife retained an investigator to obtain surveillance video of Plaintiff at his home and running errands; (2) a MetLife nurse consultant entered further record notations regarding available medical evidence; (3) MetLife attempted to schedule an IME of Mr. Kaferly, which was never completed. (*See* ECF No. 38 at 14–16.)

Regarding the video surveillance (R. at 3897–3906, 4246, 4247; ECF No. 41), this material is at most inconclusive. Videos were taken for three days in August 2011 and three days in October 2011. (ECF No. 38 at 14–15.) The videos are inherently anecdotal showing whatever the investigator happened to observe. (There is no explanation why these six days were chosen.) Fundamentally, the activities portrayed in these videos are not inconsistent with the functional limitations already described in the record during this time period.[19] (*See,*

---

decision that a change in circumstances warranted termination of the benefits it initially granted," where "[t]here [was] no evidence that [claimant] recovered the ability to perform [his] job.").

**17.** An August 21, 2010, claims entry noted that "[m]edical continue[d] to support the claimants [*sic*] inability to perform the duties of his own occupation." (R. at 144.) On March 15–16, 2011, a MetLife nurse consultant again noted that Mr. Kaferly "remains unable to safely perform functional duties such as prolonged sitting," "is unable to perform the essential duties of any job class at this time," that "medical supports a severity of impairments that would preclude [Plaintiff] from the ability to work," that he "remain[ed] disabled from his own occupation," and that "medical continues to support [Plaintiff's] inability to perform the duties of his own occ[upation]." (R. at 162–64.) A similar entry on June 24, 2011 again concluded he was disabled from his own occupation and unable to perform the duties of his own job. (R. at 165–66.)

**18.** Further notes from this call include the following:

[Plaintiff] was extremely knowledgeable regarding condition [mitochondrial disease] and went very in depth into the pathology, etc.... We discussed his symptoms, he said they were extensive ... [he] experiences entire body and mind fatigue and pure exhaustion to the point that he is almost catatonic at times .... Has terrible brain fog ... all over pain, generally no less than 5/10 ... his toes have been asleep for 2 years and his legs are discolored. Lost 35 pounds of muscle mass, has difficulty walking. Is able to perform ADL's [activities of daily living] but can't go anywhere w/ his family or kids. Can drive sometimes, maybe 1-2x/week but ... only for short distances .... Conversation was very long in duration and very in depth .... Claim is extremely complicated and needs evaluation by expert in the field.

(R. at 175–77 (emphasis added).)

**19.** As reflected in the investigator's log, for *most of the observed time, Plaintiff was inside* his home. (R. at 3901–05.) The videos also show Mr. Kaferly standing outside his home, taking a rolling trash bin to the curb, raking and operating a weed trimmer (for a total of approximately 30 minutes), driving, shopping in grocery and home supply stores, and taking

*e.g.,* R. at 174–75).

MetLife also points to a single short file note by its nurse consultant on November 9, 2011 (ECF No. 38 at 15; R. at 186–87). This was entered in follow-up to the intention to conduct an IME, noting that "[a] [m]ajority of medical [evidence] is subjective," and reiterating a "[n]eed to establish actual clinical exam findings and discrepancies in reported activities." (R. at 187.) Nevertheless, MetLife's termination appears to have relied on this conclusion regarding "subjective" evidence. (R. at 3868–69.) Absent contradictory medical evidence, this dismissal of subjective evidence and self-reported symptoms was improper. *See Ray v. UNUM,* 224 Fed.Appx. 772, 787 (10th Cir.2007) ("We permit consideration of subjective evidence of disability in ERISA cases." citing *Clausen v. Standard Ins. Co.,* 961 F.Supp. 1446, 1456 (D.Colo.1997)); *see also Carter v. Hewlett Packard Co. Income Protection Plan,* 302 Fed.Appx. 752, 753 (9th Cir.2008) ("Merely stating that there is insufficient objective evidence is insufficient.").

Regarding the IME, MetLife's file notes stated a "need to establish actual clinical exam findings" and that the "[c]laim is extremely complicated" and "needs evaluation by [an] expert in the field." (R. at 177, 187.) Yet MetLife then terminated Plaintiff's LTD benefits without completing the IME it said was necessary, or relying on other clinical evidence. Rather, MetLife's termination appears to have followed from its confusion or skepticism about Plaintiff's unusual diagnosis of mitochondrial disease, rather than from objective evidence showing that his condition had improved such that he was able to perform the duties of own occupation. Failing to

complete the IME and terminating benefits in these circumstances was in conflict both with MetLife's own statement of the need for additional clinical evidence and with its fiduciary duties under ERISA. *See Gaither,* 394 F.3d at 808.

It is also notable that during the same period, the Social Security Administration approved Plaintiff's application for SSDI disability benefits (on August 18, 2011), determining that he was disabled, and concluding that "claimant's limitations due to pain and fatigue preclude him from performing sustained work-related activities in a work setting on a regular and consistent basis (for eight hours a day, five days a week or an equivalent work schedule)." (R. at 2072.) Thus, in addition to reversing its own prior determination, MetLife's termination as of February 2012 was in conflict with the SSA's conclusion that Plaintiff was disabled. This weighed against MetLife's determination and supports the conclusion that Plaintiff remained disabled. *See Calvert v. Firstar Finance,* 409 F.3d 286, 294 (6th Cir.2005) ("the SSA determination, at a minimum, provides support for the conclusion that an administrative agency charged with examining [plaintiff's] medical records found, as it expressly said it did, objective support for [a finding of disability]."); *Holzmeyer v. Walgreen Income Protection Plan for Pharmacists and Registered Nurses,* 44 F.Supp.3d 821, 844 (S.D.Ind.2014) (" 'Disability' for social security purposes is … the 'inability to engage in *any* substantial gainful activity : …' This definition is a stringent one, and an administrator's failure to address a claimant's SSA disability finding is thus especially questionable when the ERISA plan's disability definition is less exacting.") (emphasis in original) (quoting 42 U.S.C. § 423(d)(1)(a)).[20]

his car to a repair shop for about an hour, and running other brief, unspecified errands. The investigator's log (relating only to the August 2011 videos) (R. at 3897–3906) never reflects Mr. Kaferly leaving the home for

longer than approximately two hours (R. at 3904–05).

**20.** MetLife was well aware of the SSA determination; indeed, the Plan required Plaintiff

Given the above discussion and applying *de novo* review to the evidence available as of February 28, 2012, the Court concludes that MetLife wrongly terminated Plaintiff's LTD benefits at that time and that the available evidence, including Plaintiff's own subjective reports and observations, and two years of preceding records regarding his limitations, continued to show that he was disabled, as he was unable to perform the duties of his own occupation.

### i. Evidence Arising After February 28, 2012

■■■ The later record abundantly shows that Plaintiff continued to be disabled under the Plan definition. During the first appeal process, in 2012, Plaintiff submitted additional materials and MetLife arranged for a record review by Dr. Wolf, a neurologist and psychiatrist. (R. at 3841–44, 3830–39.) Inexplicably, MetLife made no further efforts to re-schedule the IME that only months before it had said was necessary.

Conducting a "paper review" of records, Dr. Wolf concluded that "the available medical information is insufficient to determine if continuous functional limitations are indicated" as to Plaintiff's weakness, fatigue, and diffuse body pain. (R. at 3838.) She acknowledged Dr. Perlmutter's indication that Plaintiff "is unable for any type of work" [*sic*] but discounted that conclu-

sion as being "on the basis of the claimant's self reports [and] not confirmed by clinical evidence." (*Id.*) She stated that she could not "confirm . . . that the claimant has a mitochondrial dysfunction" but acknowledged that further evaluation and follow-up on this diagnosis were ongoing. (R. at 3837.) She likewise noted that "available medical information does not support . . . cognitive dysfunction."

These non-opinions from Dr. Wolf relying on the inconclusiveness or inadequacy of existing clinical records were not a sufficient basis to uphold termination of LTD benefits. *See Saffon v. Wells Fargo & Co. Long Term* , 511 F.3d 1206, 1213–14 (9th Cir.2008); *Ray*, 224 Fed.Appx. at 787, *Carter*, 302 Fed.Appx. at 753. This was particularly true where MetLife had opportunity to develop a further clinical record (including through an IME) but did not do so, and where Dr. Wolf knew further clinical workup was continuing as to Plaintiff's rare and poorly understood diagnosis of mitochondrial dysfunction. *See Gaylor v. John Hancock Mut. Life Ins.* Co., 112 F.3d 460, 467 (10th Cir.1997) ("we should not disregard the great weight of the evidence merely because objective laboratory diagnostic findings either are not yet within the state of the art, or are inconclusive").

MetLife had one of its vocational rehabilitation consultants review Dr. Wolf's

---

to apply for SSDI and MetLife had prompted Plaintiff to do so, and arranged for a consultant to assist with his application. MetLife also promptly began the process, per Plan terms, of reducing his LTD benefits to offset SSDI payments received and to collect "overpayment" of past benefits payments on the basis of the SSDI award. (R. at 180–190.)

This record casts doubt on MetLife's handling of Plaintiff's claim. *Cf. Glenn*, 554 U.S. at 118, 128 S.Ct. 2343 ("MetLife had encouraged [plaintiff] to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so (the remainder going to the lawyers it recommended), and then ignored

the agency's finding in concluding that [plaintiff] could in fact do sedentary work. This course of events . . . suggested procedural unreasonableness" and a potential conflict of interest, "because MetLife's seemingly inconsistent positions were both financially advantageous"). It is also problematic that while February 2012 termination letter stated "we have taken into consideration your [SSDI] benefits award when making our claim determination," (R. at 3869), the record reflects that MetLife did not have the relevant SSA materials in its possession at that time, and had to request them from Mr. Kaferly several months later (R. at 226, 3845).

conclusions regarding his limitations, but that included only limitations caused by lower extremity weakness (*i.e.*, excluding any limitations caused by pain, cognitive dysfunction, vision impairment, peripheral neuropathy, other neurological conditions, fatigue, or other symptoms). The consultant concluded that "[Plaintiff] would be able to do his own job." (R. at 245.) Given the consultant's extremely limited review, constituting a single five-sentence entry in the claims file addressing only Dr. Wolf's limited conclusions, it was not reasonable for MetLife to rely on this tiny fragment of the available evidence to terminate Plaintiff's benefits.

Moreover, Dr. Wolf's conclusions look especially non-conclusive in contrast to the sustained and consistent reports of disabling conditions from Plaintiff and his physicians.[21] Dr. Perlmutter plainly confirmed a diagnosis of mitochondrial disease (R. at 3848, 3766), acknowledged continued testing (*id.*), and acknowledged that the diagnosis is "relatively newly described" (R. at 3767). His supporting letter for Plaintiff's appeal noted that "[c]hronic pain is a significant issue.. at times incapacitating" and that "this patient should be considered *completely disabled from any gainful employment.*" (R. at 3848–49 (emphasis added).) Responding to Dr. Wolf's review, he

unequivocally "maintained ... that the previously described limitations in terms of functional requirements ... should be validated."[22] (R. at 3767.) Absent contradictory evidence, MetLife was not free to discard this clear medical evidence in favor of the inconclusive record review by Dr. Wolf. Nor could it ignore Plaintiff's own reports of pain, cognitive impairments, and other subjective reports of limiting conditions absent a stated reason for doing so. *See Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 362 (6th Cir.2002) (insurer may not rely only on evidence "cherry picked" from the broader record); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979) ("subjective evidence of appellant's pain, based on her own testimony and the medical reports of examining physicians, is more than ample to establish her disability, if believed"); *Austin v. Continental Cas. Co.*, 216 F.Supp.2d 550, 558 (W.D.N.C.2002) (insurer had a duty "to at least explain the basis for discrediting the subjective complaints of the claimant").

Following the 2012 appeal determination, the record evidence only becomes more conclusive that Plaintiff meets the Plan's definition of being disabled. In August 2013, Dr. Ivker opined that Plaintiff "is severely disabled both physically and mentally."[23] (R. at 1968.) In March 2014, Plaintiff obtained clinical test results sup-

---

**21.** MetLife points out that Dr. Wolf's report was provided to several of Plaintiff's physicians for review and comment and that only Dr. Perlmutter replied (R. at 3766–67) before MetLife concluded its appeal determination. (*See* ECF No. 38 at 18–19.) However, MetLife requested the physicians' review and response within two weeks and decided the appeal a week later. (*Id.*) Given the short time provided for response, the Court draws no unfavorable inference from other treating physicians' failure to respond to Dr. Wolf's review.

**22.** MetLife reads Dr. Perlmutter's statement as supporting the limitations "previously described" by Dr. Wolf. (ECF No. 38 at 19.) Reading the letter in context, and in conjunction with his earlier submission, the Court

disagrees and concludes that Dr. Perlmutter was in fact "maintain[ing]" his own prior diagnosis of mitochondrial disease and prior statement that Plaintiff was "completely disabled from any gainful employment." (*See* R. at 3849, 3767.)

**23.** Dr. Ivker's letter submission of August 20, 2013 stated, more fully, that:

Although I am a family physician and have no experience in this area, I have reviewed the reports from two neurologists and have observed and consulted with [Plaintiff] on several occasions. From the evidence I have concluded that he is severely disabled both physically and mentally. He is unable to stand or walk for prolonged periods of time, unable to lift his four year old son,

porting his diagnosis of a mitochondrial disorder. (ECF No. 30 at 15–16; R. at 1264, 1970–81.) As part of his second appeal submitted June 17, 2014, Plaintiff compiled and submitted extensive supporting evidence including the following:

- Results from an April 14, 2014 Long Term Disability Evaluation observing, among other things, that Plaintiff could sit for a maximum of thirty minutes, stand for only three to five minutes and walk for fifty to one hundred yards while taking rest breaks. (R. at 2027–64.)
- An Employability Assessment concluding that Plaintiff "certainly will not be able to earn 80% of his previous wage." (R. at 2056–60.)
- Submissions from Plaintiff and his family describing the changes in his health and condition and his limitations. His mother stated he "has difficulty with even the smallest tasks" and is "in pain every day, all day." (R. at 1998–2000.) His wife stated that his "condition still does not allow him to live any semblance of a 'normal' life.' " (R. at 1995–96.)
- A May 23, 2014 letter from Dr. Perlmutter, describing that Plaintiff "as completely disabled with reference to gainful employment." (R. at 2005–06.)
- A June 12, 2014 letter from Dr. Ivker, stating that "he clearly does not have the residual functional capacity to work an eight-hour workday for ... even one day," and "will suffer from

major physical and mental disability for the rest of his life. By any standard of disability measurement he qualifies for disability insurance." (R. at 2024–25.)

Two IMEs were conducted in response to Plaintiff's second appeal filing.[24] In reviewing their findings, Dr. Perlmutter reiterated that "Mr. Kaferly has sustained a compromise of mitochondrial function as a direct result of fluoroquinolone exposure ... [he] should be considered totally disabled from meaningful employment as a result." (R. at 448.) Dr. Ivker was even more emphatic, submitting a detailed 55 page letter with extensive citations to medical literature, and concluding: *"Mr. Kaferly is the most severely disabled patient I have treated in more than 42 years of practice*, and is highly deserving a reinstatement of his long-term disability benefits. It would be a grievous mistake to rely solely on the conclusions rendered by the two examining practitioners [the two IMEs], who clearly do not understand the condition from which he suffers." (R. at 537 (emphasis added).)

MetLife's briefing to the Court makes no attempt to counter this evidence or make a showing that Plaintiff is not actually disabled within the meaning of the Plan's terms; it relies only on its arguments regarding the standard of review and that the evidence arising after 2012 should not be considered, addressed above. Applying *de novo* review, the Court finds that the administrative record conclusively

---

and is extremely limited in his capacity to read, watch television, or to concentrate for more than a brief period of time. In addition, his memory is significantly diminished.
(R. at 1968.)

24. MetLife does not rely on the findings or conclusions of these IMEs to argue that Plaintiff was not disabled, nor direct the Court to relevant record citations from these exams,

(*See* ECF No. 38 at 21–22; *id.* at 32–43.) The Court declines to undertake this record review where MetLife has not briefed the argument. *See Meyer v. Bd. of County Comm'rs*, 482 F.3d 1232, 1242 (10th Cir.2007) ("[w]e are not charged with making the parties' arguments for them."); *Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir.1992) ("A litigant who fails to press a point by supporting it ... forfeits the point." (internal quotation marks omitted)).

shows that Plaintiff has been disabled at all relevant times under the Plan's definition.

## 2. Independent Medical Examination (IME)

■ MetLife's second cited reason for terminating LTD. benefits was because Mr. Kaferly did not attend an IME scheduled for February 3, 2012, and that the Plan terms provide that "Monthly Benefits will end on ... the date you fail to attend a medical examination requested by us." (R. at 3868, 3759.)

The parties agree that a prior IME was scheduled on January 18, 2012, agree that Plaintiff appeared for this IME, and agree that it was canceled. They disagree as to whether MetLife cancelled this IME (as the examining physician told Plaintiff at the time) or whether the examining physician canceled(as MetLife contends). In any case, the scheduled exam was cancelled, either by MetLife or by its retained agent.

MetLife then unilaterally re-scheduled for February 3, 2012. Plaintiff contends that he was not well enough to attend, (ECF No. 30 at 12), and "was not well enough at the time to understand I had a 2nd appointment." (R. at 3847; ECF No. 40-28 at 75). After Plaintiff did not attend the re-scheduled IME, MetLife made the decision to terminate his LTD benefits with no further attempts to re-schedule. (*See* R. at 207–17.)

The Court rejects this grounds for termination of Plaintiff's LTD benefits in these circumstance for several reasons. First, it is not clear MetLife itself ever truly relied on this grounds for termination. It cites policy language providing that benefits would terminate on the same date Plaintiff did not appear for the examination (here, February 3, 2012), but then terminated benefits as of February 28, 2012 (the date of their determination Plaintiff was no longer disabled) and has never argued for termination as of the earlier date. Second, given MetLife's own statements about the necessity of the IME to establish medical evidence regarding Plaintiff's condition, as well as Plaintiff's cooperation with the first scheduled IME date, MetLife's failure to reschedule an IME on another date was unreasonable and inconsistent with MetLife's duties as an ERISA Plan fiduciary. *See Gaither*, 394 F.3d at 808 (where additional evidence may prove a claim valid, fiduciary "should seek to get to the truth of the matter"). Third, Plaintiff has since appeared for two separate IMEs, so any material non-compliance with Plan terms has been cured, although MetLife now chooses not to rely on the results from those exams.

## C. NMS Limitation

■ The Plan contains a limitation that claimants with a disability due to a "neuromusculoskeletal and soft tissue disorder" are limited to a total of 24 months of benefits payments:

> Monthly Benefits are limited to 24 months during your lifetime if you are Disabled due to a:
>
> * * *
>
> 2. Neuromusculoskeletal and soft tissue disorder including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue, including sprains and strains of joints and adjacent muscles ....[25]

(R. at 37.) MetLife argues that this limitation applies to Plaintiff's condition, capping his LTD benefits after 24 months. Since Plaintiff already received benefits for more than 24 months, this limitation would likely end his claim.

---

25. The NMS Limitation goes on to enumerate a number of conditions specifically exempt from the limitation. Those exclusions are not relevant here.

MetLife argues this limitation applies because Plaintiff's "condition has affected [his] nerves and muscles." (ECF No. 38 at 44.) Plaintiff counters that the NMS Limitation "applies to spinal disorders and soft tissue ailments and can in no way be construed to include mitochondrial disease[,] which is a whole-body, systemic dysfunction at the cellular level." MetLife responds, that "[t]he question of whether or not the fluoroquinolone toxicity also resulted in mitochondrial dysfunction is irrelevant, because the functional effect of the fluoroquinolone toxicity falls within the scope of the [NMS] Limitation." (*Id.* at 45.)

The Court agrees with Plaintiff that his conditions, summarized as "autonomic peripheral neuropathy and mitochondrial dysfunction secondary to fluoroquinolone toxicity" (ECF No. 30 at 2), do not fall within the NMS Limitation. Initially, the examples of covered conditions provided in the text of the limitation itself include a "disease or disorder of the spine," and "sprains and strains of the joints and adjacent muscles." While these examples are not exclusive, they are entirely dissimilar to Plaintiff's conditions. Other courts interpreting similar limitations (which are found in many of MetLife's disability plans) have noted that in cases raising this limitation, "generally, the allegedly disabling condition . . . is a neck or back injury." *Bland v. Metro. Life Ins. Co.*, 2013 WL 56117, at *5 (M.D.Ga. Jan. 3, 2013). Here, Plaintiff does not have a neck or back injury, he is diagnosed with mitochondrial disease and neuropathy, resulting from fluoroquinolone toxicity. As Dr. Ivker stated, this "should not be considered a neuro-

musculoskeletal and soft tissue disorder. This is a systemic toxicity resulting in neurodegeneration, along with immune and endocrine dysfunction." (R. at 2024.) Plaintiff's condition is not covered under the plain meaning the NMS Limitation.

Notably, this conclusion is consistent MetLife's own most recent internal determinations. MetLife's staff suggested that the NMS limitation applied in its 2012 appeal review, but MetLife points to no more recent documentation in its own files suggesting the NMS Limitation applies. (*See* ECF No 38 at 46.) To the contrary, MetLife's file noted on July 17, 2014 that "neuropathy is not considered an LDB [limited disability benefit]." (R. at 318; *supra* at n.14.) Thus, it appears that prior to litigation, no one at MetLife had taken the position the NMS Limitation applied since 2012, despite arguing that the sole purpose of the 2014 appeal was to review this issue.

MetLife also argues that Plaintiff suffers autonomic neuropathy, and that this subjects his claim to the NMS Limitation. That application would make no sense. As stated by the National Institutes of Health, "Autonomic neuropathy is a group of symptoms, not a specific disease. There are many causes."[26] Thus, a disability involving autonomic neuropathy might or might not fall within the scope of the NMS Limitation, depending on its cause. MetLife's interpretation would make the provision absurdly overbroad. For example, MetLife cites to the online Merck Manual for autonomic neuropathies. (ECF No. 38 at 44.) That source states prominently that "[t]he best known autonomic neuropathies are those accompanying peripheral neuropathy due to diabetes, amyloidosis, or autoimmune disorders."[27] Thus, accepting

26. U.S. National Library of Medicine, "Autonomic Neuropathy," *at* https://www.nlm.nih.gov/medlineplus/ency/article/000776.htm (last visited May 19, 2016).

27. Phillip Low, M.D., Merck Manual Professional Version, "Autonomic Neuropathies," *at* http://www.merckmanuals.com/professional/neurologic-disorders/autonomic-nervous-

MetLife's interpretation, the NMS Limitation could be applied to diabetes. If diabetes can be considered a "neuromusculoskeletal and soft tissue disorder," then the limitation has no real meaning. The Court rejects MetLife's interpretation and concludes that the NMS Limitation does not apply here.

## IV. CONCLUSION

For the reasons set forth above, the Court concludes that Plaintiff has met the Plan's definition of being disabled at all times relevant to this claim, and is not subject to the NMS Limitation.[28] The Court therefore ORDERS as follows:

1. Plaintiff's Amended Motion for Summary Judgment (ECF No. 30) is GRANTED.

2. The Clerk of Court shall enter judgment in Plaintiff's favor. Plaintiff is entitled to an award of past LTD benefits from the date of termination (February 28, 2012) through the date of judgment, with interest, and Plaintiff's LTD benefits shall be reinstated as of the date of judgment and going forward.

3. Plaintiff may file an appropriate motion for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).

system/ autonomic-neuropathies (last visited May 19, 2015).

28. The Court recognizes that the Plan's definition of disability contains a separate definition that becomes applicable after 60 months. (R. at 24.) This raises the prospect that a future dispute will arise regarding Plaintiff's eligibility for LTD benefits under the second part of the definition. While the undersigned recognizes that addressing that question now might be in the interests of judicial economy, the issue is not properly before the Court, as Plaintiff has not asked for such a determination and states the provision does not apply (see ECF No. 30 at 4), and MetLife has never made any determination under this provision.